# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN RE BGC PARTNERS, INC.    )      CONSOLIDATED
DERIVATIVE LITIGATION      )      C.A. No. 2018-0722-LWW

## MEMORANDUM OPINION

Date Submitted:  May 13, 2022
Date Decided:  August 19, 2022

Christine M. Mackintosh, Michael D. Bell, and Vivek Upadhya, GRANT & EISENHOFER P.A., Wilmington, Delaware; Gregory V. Varallo and Andrew E. Blumberg, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, Wilmington, Delaware; Jeroen van Kwawegen and Christopher J. Orrico, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, New York, New York; *Counsel for Plaintiffs Roofers Local 149 Pension Fund and Northern California Pipe Trades Trust Funds*

Raymond J. DiCamillo and Kevin M. Gallagher, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Joseph De Simone, Michelle J. Annunziata, and Michael Rayfield, MAYER BROWN LLP, New York, New York; Matthew E. Fenn, MAYER BROWN LLP, Chicago, Illinois; *Counsel for Defendants Linda Bell, Stephen Curwood, and William Moran*

C. Barr Flinn, Paul Loughman, and Alberto E. Chávez, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Eric Leon and Nathan Taylor, LATHAM & WATKINS LLP, New York, New York; *Counsel for Defendants Howard Lutnick, CF Group Management, Inc., and Cantor Fitzgerald, L.P.*

**WILL, Vice Chancellor**

This is a derivative action challenging the fairness of nominal defendant BGC Partners, Inc.'s acquisition of Berkeley Point Financial, LLC from an affiliate of Cantor Fitzgerald, L.P. BGC purchased the entity for $875 million and simultaneously invested $100 million in a Cantor affiliate's mortgage-backed securities business. The theory of the lawsuit is that Howard Lutnick—the controlling stockholder of both BGC and Cantor—caused BGC to undertake a deal that benefitted him at the expense of BGC's stockholders. The plaintiffs maintain that the transaction was not entirely fair to BGC and cannot pass muster in terms of price or process.

The plaintiffs originally sued Lutnick, two Cantor entities, and the four special committee members who approved the transaction—Dr. Linda Bell, Stephen Curwood, Secretary John Dalton, and William Moran. At the pleadings stage, the court denied motions to dismiss for failure to establish demand futility and failure to state a claim. At summary judgment, the court reiterated that demand was excused but dismissed the special committee members other than Moran, whose actions and uncertain independence created triable questions of fact. The remaining claims to be tried were breach of fiduciary duty claims against Lutnick (and the Cantor entities he controlled) and Moran. The question of demand futility was also presented for resolution at trial. This is the court's post-trial decision.

1

Going into trial, the plaintiffs highlighted a series of problems with the potential to fatally undermine the fairness of the transaction. They asserted that the transaction was a *fait accompli* constructed by Lutnick. They painted the special committee as ineffective, repeatedly acceding to Lutnick's whims. They accused Cantor of withholding valuation information from the special committee. In terms of the economics, they argued that the special committee accepted an inflated price for Berkeley Point designed to cover Cantor's tax liability despite a lower figure being floated months before. And they described the $100 million investment as money losing.

The plaintiffs scored some points at trial. Lutnick initiated the deal. He had a financial incentive to cause BGC to overpay for Berkeley Point. He overstepped in identifying advisors for the special committee and asking its co-chairs to serve. Moran had one-off discussions with Lutnick that should never have happened. When it came time for the final negotiations, the special committee's written counterproposal did not reflect its preferred structure. And there remains some mystery around how the ultimate deal was reached.

The evidence presented by the defendants, however, carried the day. The special committee and its advisors were independent. Though the process was marred by Lutnick and Moran's actions, Lutnick extracted himself from the special committee's deliberations after it was fully empowered. Moran pushed back on

2

Lutnick when needed and worked tirelessly on the committee's behalf. The special committee's diligence requests were met and it had the information it needed to negotiate on a fully informed basis. The committee members—each engaged and diligent—bargained with Cantor and obtained meaningful concessions.

Berkeley Point was, by all accounts, a unique asset particularly appealing to BGC. The price the Special Committee agreed to pay for Berkeley Point was in line with what its financial advisor determined to be appropriate and falls within what I conclude to be the range of fairness. The size of the additional investment was cut by a third while retaining its strategic benefits to BGC.

I therefore find that the Berkeley Point acquisition and associated investment were entirely fair to BGC and its minority stockholders. Lutnick and the Cantor entities did not breach their fiduciary duties. Nor did Moran, who did not act disloyally. Judgment is for the defendants.

## I.    FACTUAL BACKGROUND

The following factual findings were stipulated to by the parties or proven by a preponderance of the evidence at trial.[1]  Trial lasted five days, during which eleven fact witnesses and two expert witnesses testified live.[2]  The parties introduced 1,260 exhibits including eighteen deposition transcripts.[3]

### A.    BGC, Cantor, and Lutnick

The nominal defendant in this case is BGC Partners, Inc., a brokerage and financial technology company incorporated in Delaware and headquartered in New York that trades on the NASDAQ.[4]  Its predecessor entity, BGC Partners L.P., was formed in 2004 when it was spun off from defendant Cantor Fitzgerald, L.P., a privately-owned financial services and brokerage firm.  BGC became a public company as the result of a merger with eSpeed Inc. in 2008.[5]

At the time of the transaction at issue in this litigation, defendant Howard Lutnick was the Chairman and Chief Executive Officer of both Cantor and BGC.[6]

---

[1] Dkt. 243 ("PTO").  Where facts are drawn from exhibits jointly submitted by the parties at trial, they are referred to according to the numbers provided on the parties' joint exhibit list and cited as "JX __" unless defined.  Pin cites refer to the page numbering overlaid on each joint exhibit. Trial testimony is cited as "[Name] Tr."  Deposition transcripts are cited as "[Name] Dep."

[2] Dkts. 252-57.

[3] Dkt. 251.

[4] PTO ¶¶ 53, 55.

[5] *Id.* ¶ 54.

[6] *Id.* ¶¶ 24-25.

4

He was also the sole stockholder of Cantor's managing partner, defendant CF Group Management, Inc. ("CFGM").[7] Lutnick had voting control of BGC through CFGM and his indirect ownership of about 55% of Cantor.[8] For purposes of this decision, Cantor, CFGM, and Lutnick are together referred to as the "Cantor Defendants."

In 2011, BGC began to build up its real estate platform. It acquired commercial real estate services company Newmark (then-Newmark Grubb Knight Frank).[9] In 2014, Newmark acquired Apartment Realty Advisors ("ARA"), a brokerage company that brokered the sale of multifamily properties.[10]

Still, Newmark was not a full service platform that could broker the sale of properties, originate loans, and service those loans. In particular, it lacked a so-called "agency lender" to pair with its brokerage services.[11] This gap in Newmark's business put it at a disadvantage relative to its competitors.[12]

Agency lenders are real estate finance companies that are pre-approved to originate and sell multifamily and commercial real estate loans on behalf of government-sponsored enterprises ("GSEs") such as Fannie Mae and Freddie Mac.[13]

---

[7] *Id.* ¶ 27.

[8] *Id.* ¶¶ 26-28.

[9] JX 880 at 7; *see* Gosin Tr. 970, 974.

[10] JX 880 at 7; *see* Okland Tr. 94-96.

[11] Okland Tr. 99-101, 105-07.

[12] *Id.*; Day Tr. 31-32; Sterling Tr. 233-34.

[13] PTO ¶ 56; JX 911 ("Bacon Report") at 4.

5

They serve as intermediaries that can originate and underwrite loans for the GSEs across the entire market.[14]

Historically, Fannie Mae and Freddie Mac have provided financing at lower yields compared to other financial institutions. As a result, the volume of GSE loans dwarfs the volume of loans from other potential funding sources, making agency lenders particularly valuable.[15] Agency lenders are also rare because GSEs limit the number of lending licenses they issue. For example, Freddie Mac had 22 licensed pre-approved lenders as of 2020.[16]

## B.    Berkeley Point

Before the transaction at issue in this litigation, Berkeley Point Financial LLC was a private commercial real estate finance company. It was (and remains) one of the few pre-approved agency lenders.[17] It also services commercial real estate loans, including those it originated.[18]

In April 2014, at a time when GSE loan origination volumes were falling industry-wide, Berkeley Point was acquired by Cantor Commercial Real Estate

---

[14] Bacon Report at 7.

[15] *Id.* at 5.

[16] *Id.* at 12-13.

[17] PTO ¶ 56.

[18] *Id.*

Company, LP ("CCRE") for $259.3 million.[19]  CCRE was then owned by Cantor and various outside investors.[20]

CCRE invested heavily in Berkeley Point and worked to integrate it into Cantor's commercial real estate platform.  Between 2014 and 2016, Berkeley Point experienced growth driven by factors including a strengthening multifamily real estate market and certain synergies with Cantor-affiliated entities.[21]

In terms of the market, Berkeley Point's growth coincided with an increase in GSE loan origination volumes.  For example, from 2014 to 2016, Fannie Mae and Freddie Mac multifamily loan origination volumes grew roughly 96%[22] and Berkeley Point's revenue and EBITDA grew by 80% and 73%, respectively.[23] Berkeley Point's market share of Fannie Mae and Freddie Mac loans increased from 5.4% to 6.0% during this time.[24]

In terms of synergies, Berkeley Point flourished in part due to its ties to other Cantor affiliates, including Newmark and ARA.[25]  BGC, lacking agency lending

---

[19] *Id.* ¶ 75.

[20] *Id.* ¶¶ 76-77.

[21] JX 405 at 22; Day Tr. 24.

[22] JX 928 ("Hubbard Rebuttal Report") at 60.

[23] *See* JX 912 ("d'Almeida Opening Report") ¶ 64; JX 611 at 14.  Berkeley Point's calculation of EBITDA is discussed in greater depth in Section II.B.2.a.iii below.

[24] JX 792 at 30.

[25] JX 405 at 22.

abilities, tried to fill the gap in its platform through a referral relationship with Berkeley Point. Newmark and ARA brokers would refer potential borrowers to Berkeley Point originators for GSE financing.[26] Berkeley Point became increasingly reliant on referrals from these BGC subsidiaries, which accounted for a steadily growing proportion of Berkeley Point's overall origination volume between 2014 and 2016.[27]

Both Newmark and Berkeley Point's executives found this referral relationship imperfect. The offering was not streamlined and the lack of integration stood in contrast to Newmark and Berkeley Point's competitors.[28] Newmark also worried that, without in-house agency lending capabilities, it might lose ARA brokers when it came time to renegotiate their contracts, imperiling its multifamily platform.[29] The only way for Newmark to secure the in-house GSE lending capabilities it desired was by acquiring an agency lender like Berkeley Point.[30]

---

[26] Okland Tr. 98.

[27] JX 448 at 2, 4; Okland Tr. 123-24.

[28] Day Tr. 30-31; Okland Tr. 98-99.

[29] *See* Okland Tr. 101-02.

[30] Bacon Tr. 156-57; *see* Day Tr. 31-32; Sterling Tr. 233-34.

## C. The CCRE Investor Buyout

In 2016, Cantor commenced buyout discussions with the other CCRE investors.[31] At this point, CCRE was made up of two businesses: Berkeley Point and a commercial mortgage-backed securities ("CMBS") business.[32] CCRE's CMBS business originates, underwrites, pools, securitizes, and sells commercial real estate loans and securities.[33]

Lutnick had reached agreements in principle with each of CCRE's investors by February 2017.[34] Cantor agreed to pay approximately $1.1 billion in the aggregate for the 88% of CCRE it did not own.[35] Cantor considered a sale of Berkeley Point as a second step in a chain of transaction. If Cantor owned CCRE outright, it could facilitate a sale of Berkeley Point to BGC, where it could be combined with Newmark before taking Newmark public.[36]

On February 9, 2017, BGC announced that it had filed a confidential registration statement with the SEC for an initial public offering of Newmark.[37] The next day, a representative of investment bank Sandler O'Neill + Partners, L.P.

---

[31] PTO ¶ 76.

[32] *Id.* ¶ 58.

[33] *Id.*

[34] PTO ¶ 77.

[35] *Id.* ¶¶ 76-77.

[36] Lutnick Dep. 30-33.

[37] JX 235.

reached out to BGC's Chief Financial Officer, Steve Bisgay, about a potential underwriting role in the IPO.[38] Sandler partner Brian Sterling had told his colleagues that the bank's "best access" to the IPO was through Bisgay.[39] It is not clear whether Bisgay ever responded. Sandler was not given a role in the IPO.

### D. The Special Committee's Formation

On February 11, 2017, the Audit Committee of BGC's board of directors (the "Board") held a meeting.[40] The Audit Committee consisted of the entire BGC board of directors (the "Board") save Lutnick—non-parties Dr. Linda A. Bell, Stephen T. Curwood, Secretary John H. Dalton, and defendant William J. Moran.[41] Bell is the Provost, Dean of Faculty, and Claire Tow Professor of Economics at Barnard College.[42] Curwood is a Pulitzer-prize winning journalist who focuses on issues of environmental justice.[43] Dalton is a former Secretary of the Navy and president of Ginnie Mae.[44] Moran is a former General Auditor of JPMorgan Chase & Co.[45]

---

[38] JX 240.

[39] JX 237.

[40] JX 241.

[41] *Id.*

[42] Bell Tr. 535.

[43] Curwood Tr. 715, 721-22.

[44] Dalton Dep. 24; Bell Tr. 575-76.

[45] Moran Tr. 796.

At the meeting, Lutnick informed the Audit Committee that BGC management was considering "a substantial acquisition."[46] He explained that Cantor had come to an agreement in principle to buy out the other CCRE investors, which "was expected to allow Cantor to sell Berkeley Point to [BGC]" and give BGC an "[agency lending] business of scale to compete with" its competitors.[47] He "proposed that the Company be authorized to attempt to resolve terms and close the transactions by the end of the quarter."[48]

Lutnick commented "on [a] potential purchase price" for Berkeley Point "in the low $700 million range."[49] At trial, he testified that the "low $700 million range" was not based on any type of valuation modeling but a back-of-the-envelope estimate.[50] The other Board members did not view his comment during the meeting as an offer.[51]

---

[46] PTO ¶ 79.

[47] JX 241.

[48] *Id.*

[49] *Id.*

[50] Lutnick Tr. 1274-75; *see* Edelman Tr. 411-12.

[51] *See* Bell Tr. 539; Moran Tr. 811-12.

Lutnick also "discussed related party considerations" for the potential acquisition, given that he was an officer and controlling stockholder of both BGC and Cantor.[52] A special committee was formed as a result.[53]

The members of the Audit Committee—Moran, Bell, Curwood, and Dalton— "unanimously authorized that the Audit Committee act as a special committee" (the "Special Committee") on BGC's behalf with respect to the proposed transactions.[54] They "approved the engagement of appropriate legal and financial advisors to provide independent services to the Committee; and authorized management to negotiate the transactions as generally discussed, with specific details to be approved."[55]

The full Board met after the Audit Committee meeting concluded.[56] The Board ratified the Audit Committee's authorization to act as a Special Committee. And it unanimously "authorized management to proceed to negotiate the transactions as generally discussed."[57]

---

[52] JX 241.

[53] *Id.*; *see* Moran Dep. 174.

[54] JX 241.

[55] *Id.*

[56] *Id.*

[57] *Id.*

Cantor began analyzing a workable deal structure for the sale of Berkeley Point following the meeting. Cantor's internal team, led by Charles Edelman (its Head of Mergers & Acquisitions), modeled a transaction in which BGC purchased "100% of Berkeley Point for ~$[700] million" and made a "~$[125] million investment into CCRE['s] CMBS business."[58] The price and size of the investment were rough approximations, as evidenced by the brackets.[59]

### E. Advisor Outreach

Shortly after the February 11 Board meeting, Moran and Lutnick discussed the Special Committee.[60] Lutnick asked Moran if he would be willing to serve as the Special Committee's chair; Moran agreed.[61] Days later (on February 22), Lutnick asked Bell to act as Moran's co-chair. She also agreed.[62]

After Moran spoke with Lutnick, Moran began seeking out advisors for the Special Committee with the assistance of Caroline Koster, BGC's Chief Counsel and Cantor's Associate General Counsel.[63]

---

[58] JX 1228 at 5.

[59] Edelman Tr. 410-11.

[60] JX 249.

[61] Moran Dep. 171-73.

[62] JX 283.

[63] PTO ¶ 65.

Moran hoped to engage Debevoise & Plimpton LLP to serve as the Special Committee's legal advisor. On February 13, Koster told Moran, "I let Howard know you wanted to retain [William] Regner [of Debevoise], and he was generally fine with that and wants me to help you connect with him."[64] Moran felt that it was a "good business practice" to run the retention of advisors past Lutnick.[65] Moran also ran the retention of Regner by the other Special Committee members, who were "fine" with the selection.[66] Bell was not aware that Moran had raised the retention of Debevoise with Lutnick.[67]

Moran also worked to identify a financial advisor for the Special Committee. On February 14, he asked Koster to "send [him] info on bankers"—specifically, Houlihan Lokey and Sandler.[68] Sandler had performed some prior work for BGC, overwhelmingly advising special committees against Lutnick and Cantor.[69]

Koster sent Moran contact information for individuals at Houlihan and told Moran "[m]aybe I should ask [Lutnick] if this is who he had in mind or if there is another name."[70] Koster wrote to Moran, "[Lutnick] says it's fine for YOU to

---

[64] JX 256.

[65] Moran Tr. 895-96.

[66] JX 266.

[67] Bell Tr. 663-64, 666.

[68] JX 266.

[69] Sterling Tr. 389-390.

[70] JX 266.

contact the banks and start talking to them—[h]e thinks it should not be the lawyer, but should be you. So, feel free to reach out to them. I separately sent you the Sandler info."[71]

On February 16, Koster sent Moran a contact list that included information for Houlihan, Brian Sterling at Sandler, and Ralph "Trey" Taylor III of the Taylor Companies, who Dalton had suggested.[72] Moran asked, "[h]ave you [run] [T]rey past [Lutnick]?"[73] Koster suggested that Moran "call [Taylor Companies] last . . . I'm sure they are very reputable, and [Dalton's] endorsement says a lot, but since we don't know them, let's see if [Lutnick] wants to discuss first."[74] Moran "[a]gree[d]."[75]

Moran began his outreach to Sandler and Houlihan, first contacting Sandler.[76] On February 16, 2017, Sterling wrote to Moran and Regner to reiterate his interest in working with the Special Committee. Sterling relayed his understanding that the engagement would include Sandler "providing financial advisory services to the Special Committee, including negotiation of a transaction, and then delivering a

---

[71] JX 268.

[72] JX 269.

[73] *Id.* (lightly edited for clarity).

[74] *Id.*

[75] *Id.*

[76] *See* JX 270.

fairness opinion if the Special Committee determine[d] to enter into a deal."[77] Moran forwarded the email to Koster and Lutnick, asking, "are we going to want them to negotiate price????"[78] A few hours later, Lutnick wrote to Moran with the subject line "Negotiate" and one word in the body: "Yes."[79]

### F. The Special Committee's Reestablishment and Retention of Advisors

In early March, Sandler and Houlihan were interviewed as prospective financial advisors to the Special Committee.[80] Moran was the only Special Committee member that participated in the telephonic meetings. Regner and Lutnick joined.[81] Bell was not made aware that Lutnick was involved in these meetings.[82]

The meeting with Sandler was held on March 2. The next day, Sandler sent Moran and Regner a draft engagement letter contemplating a total fee of $1 million, with $350,000 contingent on the deal closing.[83] Houlihan also provided a draft

---

[77] *Id.*

[78] *Id.*

[79] JX 274.

[80] *See* JX 290; JX 298; Bell Tr. 680.

[81] *See* JX 290; JX 298.

[82] Bell Tr. 680.

[83] JX 299; JX 300.

16

engagement letter after its meeting with Moran and Lutnick that proposed a $3.5 million fee.[84]

On March 14, the Board met and formally reestablished the Special Committee.[85] The resolutions provided that the Special Committee was delegated the "full and exclusive power and authority of the Board" to "evaluate and, if appropriate, negotiate the terms of any Proposed Transaction and to make any recommendations to the Board" that it "determine[d] in its sole discretion to be advisable."[86] The Special Committee was also authorized to retain any advisors it deemed appropriate.[87]

The Special Committee met the next day.[88] Lutnick was not present. It voted to designate Moran and Bell as its co-chairs. It then considered "two potential financial advisors": Sandler and Houlihan.[89] Materials had been circulated to the Committee in advance that detailed the bankers' qualifications and proposed fees. After discussing the "qualifications and experience" of each, the Committee voted

---

[84] JX 305.

[85] JX 313.

[86] *Id.*

[87] *Id.*

[88] JX 319.

[89] *Id.*

to retain Sandler—led by Sterling—as its financial advisor.[90] It then voted to retain Debevoise as legal counsel to the Committee.[91]

### G. Diligence Begins

The Special Committee's process was underway by mid-March 2017. Between March and June, the Special Committee met at least nine times.[92]

On March 17, Sterling emailed Moran to provide the data room index for the materials received from Cantor. Moran forwarded the email to Lutnick, pressing him for additional data.[93] He also stated that he had expressed to Regner and Sterling "that we are running a clock [] on this deal."[94] Bell testified that she did not believe that the Special Committee was "running any clock."[95]

Any apparent timeline shifted in late March. On March 21, Sandler sent its initial due diligence requests to Cantor.[96] A week later, Sterling emailed Cantor to "check[] in on the status of [their] information requests and the process generally."[97] Still without the information requested, Regner sent a follow-up email on April 6.

---

[90] *Id.*

[91] *Id.*

[92] *See* PTO ¶¶ 83-98.

[93] JX 331.

[94] *Id.*

[95] Bell Tr. 685-86.

[96] JX 377.

[97] *Id.*

Cantor responded that the diligence requests were "in progress" and that materials would be made available via the data room when ready.[98]

Moran forwarded the chain to Lutnick, asking whether Lutnick had "changed our original timetable for execution???"[99] Lutnick responded four days later, saying that the deal "[s]hould start to move quickly [at the] end of th[at] week as we will send lawyer and banker the full desk outline and structure." "Structure," he wrote, "became the driver."[100] By that, Lutnick meant that Cantor was focused on devising a transaction structure that would be more tax efficient for Cantor.[101]

Cantor had begun to assess the tax implications of possible transaction structures and asked Kirkland & Ellis LLP and KMPG to conduct an analysis.[102] On April 13, Kirkland sent a "summary of the pros and cons from a tax perspective" of various deal scenarios with an analysis from KPMG.[103] Kirkland opined that an outright sale of Berkeley Point to BGC "in a fully taxable transaction for $[725] million" would cause Cantor to incur an immediate cash tax liability of $70 million.[104]

---

[98] *Id.*

[99] *Id.*

[100] *Id.*

[101] Lutnick Tr. 1375.

[102] *See* JX 379; Lutnick Tr. 1375-78; Edelman Tr. 415-16.

[103] JX 379.

[104] *Id.*

Kirkland also considered a structure whereby BGC would invest in CCRE, entitling it to 98% of the future profits from Berkeley Point's business with Cantor receiving the remaining 2%.[105] Unlike the immediate tax liability triggered by the first scenario, the investment would give rise to taxes recognizable over time.[106] Cantor viewed this tax-efficient structure, through which it retained a small equity interest in Berkeley Point, as its preferred option.[107]

Thus, Cantor settled on a structure involving a sale to BGC of a 95% economic interest in Berkeley Point rather than an outright purchase.[108]

## H. The April 21 Meeting and Term Sheet

The Board met on April 21, 2017. Lutnick provided an update on the transaction. According to the minutes, he "indicated that [BGC] management would distribute a term sheet to the directors to facilitate discussion on the Company's proposed investment in CCRE in a tax-efficient structure."[109] He explained that Cantor's proposed structure would have BGC would own "virtually all of CCRE's

---

[105] *Id.*

[106] *Id.*

[107] Edelman Tr. 416-17.

[108] *Id.*

[109] JX 383.

Berkeley Point business (with Cantor maintaining a small ownership percentage), and make a $150 million investment in CCRE's CMBS business."[110]

In terms of next steps, Lutnick said that he (on behalf of Cantor) would provide the Special Committee with "a presentation indicating valuation of the CCRE business."[111] According to the minutes, Lutnick indicated that Newmark's Chief Executive Officer Barry Gosin "would consider Cantor's valuation analysis and respond with an analysis based on the Company's perspective of value."[112] "The Special Committee could then discuss, consult its financial and legal advisors, and negotiate the framework for a transaction."[113]

That night, Koster sent Cantor's proposed term sheet to the Special Committee members and Regner.[114] The term sheet contemplated the structure that Lutnick had described during the Board meeting. Under Cantor's proposal, BGC would purchase a 95% interest in Berkeley Point for $850 million and would have the option to purchase the remaining 5% of Berkeley Point for $30 million no sooner than five years after closing. BGC would also invest $150 million in CCRE's CMBS business with a preferred return and an option to exit the investment after five

---

[110] *Id.*

[111] *Id.*

[112] *Id.*

[113] *Id.*

[114] JX 385; JX 386.

years.[115] Cantor viewed the April 21 term sheet as the first true offer for Berkeley Point—earlier discussions were "more of a concept."[116]

When Sandler and Debevoise spoke to Cantor representatives about the proposal several days later, they "expressed surprise" at the change in structure.[117] Until that point, the parties had discussed BGC acquiring 100% of Berkeley Point.[118] Cantor representatives told Lutnick that, after discussion, Sandler and Debevoise "appear[ed] to appreciate the tax deferral aspect and to understand the general structure."[119]

Lutnick and Edelman formally presented Cantor's proposal to the Special Committee on May 11, 2017.[120] Their presentation included Cantor's view on Berkeley Point's value.[121]

## I. Due Diligence Continues

Due diligence continued through late April and into May 2017. By April 21, Cantor had provided responses to many of Sandler's diligence questions and had

---

[115] JX 386; Edelman Tr. 418-20.

[116] Edelman Tr. 422.

[117] JX 397.

[118] *See* Sterling Tr. 221-28.

[119] JX 397.

[120] JX 465; JX 406.

[121] *See, e.g.*, JX 406 at 8, 17-18.

uploaded corresponding materials to the data room.[122]  By April 23, Lutnick said that the data room "ha[d] been properly populated and information requests answered."[123]

On May 2, Lutnick attended an Audit Committee meeting.  According to the minutes, Lutnick discussed the timing of the transaction and said that "the plan was for [BGC] and Cantor to work towards an agreement by the end of the month of May with an announcement of the deal negotiated."[124]  Koster recounted to Edelman that "[Lutnick] [had] lit a fire under" the Special Committee during the meeting.[125]

The Special Committee pressed forward with its information requests.  On May 5, Sandler sent Cantor a list of outstanding diligence requests, including the terms of Berkley Point's acquisition by CCRE in 2014 and of Cantor's buyouts of CCRE's outside investors in 2017.[126]  The list was forwarded to Lutnick, who asked, "[h]ow are we working on [this] and deciding what to give them[?]"[127]  Edelman responded that some of the information, "for example, the terms of the CCRE

---

[122] JX 387.

[123] JX 389.

[124] JX 412.

[125] JX 423.

[126] JX 445.

[127] *Id.*

23

investor buy-outs" were "not [the Special Committee's] concern."[128] "Agreed," said Lutnick. "Choose what to tell them. You decide."[129]

Edelman did not initially send the information. He felt that the information about the 2014 acquisition of Berkeley Point "was essentially irrelevant and likely to obfuscate the value of the company" and that the details of the 2017 buyouts were likewise "irrelevant" and could "be used against [Cantor] in the negotiations."[130]

## J.      Berkeley Point Projections

Sandler had also requested multi-year projections for Berkeley Point's business.[131] Berkeley Point did not create projections in the ordinary course.[132] Cantor directed Berkeley Point's Chief Financial Officer Ira Strassberg to develop a set in connection with the 2017 transaction.[133] Strassberg proceeded to review Berkeley Point's historical financial performance, analyze its pipeline of future business, and meet with Berkeley Point employees as well as the Cantor deal team.[134] He developed a set of projections that he felt were "conservative."[135]

---

[128] *Id.*

[129] *Id.*

[130] Edelman Tr. 425-26.

[131] JX 422; JX 445.

[132] Strassberg Tr. 1121, 1165-66.

[133] *Id.* at 1121-22.

[134] *Id.* at 1122-23.

[135] *Id.* at 1140-41.

On May 1, Strassberg sent Lutnick the draft projections.[136] Strassberg expressed a view that "there [was] an opportunity to increase [Berkeley Point's] capture rate" in the future.[137] The "capture rate" referred to is the share of ARA investment sales Berkeley Point converted into loan originations.[138] Lutnick agreed, writing that the capture rate was "way too low" and asked Strassberg to run a sensitivity analysis with a series of higher capture rates for 2017 and 2018.[139]

Separately, Strassberg increased certain other figures from his May 1 draft after he received more granular forecasts for April and May 2017 and spoke to more individuals.[140] For example, the May 8 version he sent to Cantor included roughly 6% higher revenue and origination volume projections, which were hard-coded in by a series of increases.[141] The adjustments were not made at Lutnick's request.[142]

Sandler received Strassberg's final projections on May 19, discussed them with Cantor, provided them to the Special Committee, and later considered the projections when concluding that the acquisition was fair.[143]

---

[136] JX 408; JX 416.

[137] JX 416.

[138] Strassberg 1132-34; *see* JX 408.

[139] JX 416.

[140] Strassberg Tr. 1133-35, 1137-38.

[141] *Id.* at 1138-40; JX 976 ("Origination volumes" tab at cells B6-B14).

[142] Strassberg Tr. 1138.

[143] *See* JX 491; JX 451; JX 663; JX 1223; *see* Sterling Tr. 288-89; Bell Tr. 695-96; Moran Tr. 926-27.

### K. Gosin's Meeting with the Committee

On May 4, Koster emailed Gosin, "[t]he Special Committee is asking for a meeting/presentation from you regarding your interest in the [Berkeley Point] and CMBS business, etc. Howard said he would speak with you about this today."[144]

Gosin subsequently contacted Shekar Narasimhan, the Managing Partner of Beekman Advisors, for input. Beekman had advised CCRE in its 2014 acquisition of Berkeley Point and ARA in connection with its sale to BGC.[145]

Narasimhan sent Gosin "a background piece on the multifamily debt market and the GSE multifamily business in particular."[146] In a later communication, Narasimhan told Gosin that that he believed that Berkeley Point's value was "probably $462M-$672M."[147] Gosin testified that he questioned the reliability of Narasimhan's analysis.[148]

On May 19, Gosin met with the Special Committee as planned and provided it with a qualitative assessment of the potential Berkeley Point transaction.[149] He relayed his perspective that an acquisition of a majority interest in Berkeley Point

---

[144] JX 443.

[145] JX 454.

[146] JX 457.

[147] JX 490.

[148] Gosin Tr. 1096-97.

[149] JX 488; Bell Tr. 605-06.

could be "transformative" for BGC due to "potential future growth opportunities and synergies with Newmark's existing business."[150] He did not provide any quantitative analysis of value—nor did the Special Committee expect him to.[151] Gosin also did not relay Narasimhan's views.[152]

### L. Negotiations Proceed

On May 21, Lutnick sent Bell and Moran an instant message to "check[] in."[153] A few days later, Moran told Lutnick that the Special Committee was "[i]n full support of [the] deal" so long as the "price [was] right."[154]

Meanwhile, Sandler continued to request information about the terms of the 2017 buyout and of CCRE's 2014 acquisition of Berkeley Point.[155] At a May 25 meeting, the Special Committee expressed "the need to better understand the economic terms, including valuation, of CCRE's acquisition of Berkeley Point in 2014, and the prices at which CCRE's outside investors invested and will exit."[156]

---

[150] JX 488; Gosin Tr. 997-98.

[151] Bell Tr. 606-07; *see* Moran 961-62.

[152] Bell Tr. 610-11; Gosin Tr. 1089-90.

[153] JX 496.

[154] JX 509.

[155] JX 515.

[156] JX 510.

Also during its May 25 meeting, the Special Committee discussed an updated term sheet that Cantor had sent dated May 23.[157] The term sheet continued to contemplate a $1 billion total investment by BGC across Berkeley Point and the CMBS business.[158]

On May 30, Cantor provided Sandler with the information it had been requesting about the terms of the 2014 transaction and 2017 buyouts.[159] On June 1, Sandler told the Special Committee that several diligence items remained outstanding and that it "would be in a position to discuss valuation with the Committee" after receiving them.[160] Sandler was eventually "successful in getting the due diligence materials it needed."[161] The Special Committee understood that it was "important to take the time it need[ed] to digest the diligence items and better understand the strategic rationale for the Proposed Investment and valuation of Berkeley Point before responding to Cantor."[162]

---

[157] JX 510; JX 514.

[158] JX 503.

[159] JX 521.

[160] JX 526.

[161] Sterling Tr. 219-220.

[162] JX 526; *see* Bell Tr. 559-60.

## M. The Special Committee's Counterproposal

Sandler worked to prepare a presentation for the Special Committee that summarized its views on Berkeley Point and responded to Cantor's May 23 proposal. Sandler's presentation was shared with the Special Committee at a June 4 meeting.[163] The presentation included an "advocacy piece" intended for use against Cantor at the bargaining table.[164] That advocacy piece was sent to Cantor on the morning of June 6, with a note that the deck contained "valuation considerations and the response to the Cantor proposal."[165]

The deck explained why the Special Committee believed Berkeley Point was not worth the $880 million Cantor had offered (which reflected an $850 million initial payment for 95% of Berkeley Point, plus BGC's $30 million put option on the remaining 5% that could be exercised in five years).[166] It proposed that the price be reduced from $880 million to $720 million, which it said "represent[ed] an appropriate value for Berkeley Point."[167] The $720 million price was based on a

---

[163] JX 553; JX 554.

[164] JX 554 at 29-44; *see* Bell Tr. 562-66.

[165] JX 571.

[166] JX 554 at 13; JX 566; *see* Edelman Tr. 443.

[167] JX 566 at 11.

number of considerations, including that a 25% illiquidity discount to the $880 million ask could be warranted.[168]

In terms of the CMBS investment, the presentation stated that an investment in CCRE's CMBS business could be "helpful to Newmark strategically" but was "not compelling" for BGC on the terms Cantor had proposed.[169] It explained that Cantor had "provided no support or justification for the investment to be sized at $150 million."[170] The Special Committee therefore proposed that the investment size be reduced to $100 million.[171]

## N.    The June 6 Meeting

Later on June 6, the Special Committee, Cantor, and their representatives met to negotiate a potential deal.[172] According to the minutes, Cantor's proposal going into the meeting was for BGC "to acquire a majority interest in Berkeley Point for $880 million, or acquire all of Berkeley Point for $1 billion, and invest $150 million in the CMBS Business."[173]

---

[168] JX 566 at 11; Sterling Tr. 262; *see* Bell Tr. 564, 703.

[169] JX 566 at 13.

[170] *Id.* at 14.

[171] *Id.* at 15.

[172] JX 570.

[173] *Id.*

The Special Committee members and advisors testified at trial that acquiring 100% of Berkeley Point had become their top priority as the process unfolded and would be a walkaway point for them in final negotiations without a major concession on price.[174] As Bell explained, they "believed strongly in the value of liquidity and control."[175] Before the meeting, Sandler had expressed to Cantor the Committee's preference for the outright purchase structure.[176] Cantor made its $1 billion proposal for BGC to acquire 100% of Berkeley Point as an "alternative proposal and structure" in response.[177]

At trial, Cantor witnesses testified that the $1 billion price reflected what Cantor thought it could get for Berkeley Point on the open market.[178] Edelman testified that the disproportionately large jump in price for the final 5% of Berkeley Point was intended to cover the additional tax liability that would be incurred by an outright sale.[179]

The minutes of the June 6 meeting provide that Sterling began by walking the meeting participants through the Special Committee's response to Cantor's proposal

---

[174] Sterling Tr. 220-22; Bell Tr. 569-70; Curwood Tr. 744-45; Moran Tr. 836-37; *see* Edelman 521-24.

[175] Bell Tr. 572.

[176] Sterling Tr. 220-21, 225-26, 368; Edelman Tr. 433-34.

[177] JX 565.

[178] Edelman 434-45; Lutnick Tr. 1244-45.

[179] Edelman Tr. 434-35; Sterling Tr. 368-69; *see* JX 379; Lutnick Tr. 1285.

using the advocacy piece.[180] He next conveyed the Special Committee's counteroffer: "to acquire a majority interest in Berkeley Point for $720 million and invest $100 million in the CMBS Business, with several additional changes to the security proposed by Cantor."[181]

Cantor was displeased with the Special Committee's $720 million counteroffer.[182] The Special Committee indicated it could get closer to Cantor's price if they could buy the business outright.[183] After discussion, Cantor's representatives and outside counsel left the meeting to caucus.[184] The Special Committee dispatched Moran, then Bell, to meet with Lutnick and his advisors separately.[185] Moran told Lutnick that the deal would not happen as Cantor had constructed it.[186] Bell hoped to come to terms since she viewed the transaction as a good opportunity for BGC and Newmark.[187]

---

[180] JX 570; *see* Bell Tr. 627.

[181] JX 570; *see* Bell Tr. 627.

[182] Edelman Tr. 522; Moran Tr. 823-44.

[183] Edelman Tr. 521-24.

[184] JX 570; *see* Sterling Tr. 403-05.

[185] Sterling Tr. 270; Bell Tr. 571-72; Moran Tr. 944-45.

[186] Moran Tr. 844.

[187] Bell Tr. 632.

At 3:15 p.m., Cantor rejoined the meeting and "conveyed Cantor's counterproposal."[188]  No witness at trial could recall what exactly Cantor counter-proposed.[189]  The minutes provide that approximately thirty minutes of "discussion, debate and negotiation over the terms of the transaction ensued."[190]

The two sides subsequently reached a handshake agreement.  BGC was to purchase Berkeley Point outright for $875 million and invest $100 million into CCRE's CMBS business for a five-year period.[191]  BGC would receive a preferred 5% return on the CMBS investment, with Cantor prohibited from receiving distributions from the business until the preferred return was met.[192]  The parties also agreed that Berkeley Point would be delivered to BGC at closing with a book value as of March 31, 2017.[193]

---

[188] JX 570 at 2.

[189] *See, e.g.*, Sterling Tr. 264, 404-05; Bell Tr. 630-31; Lutnick 1405-06.

[190] JX 570.

[191] *Id.*

[192] *Id.*

[193] JX 572; Edelman Tr. 482-84.

## O.    Sandler's Fairness Opinion and the Special Committee's Approval

The parties' June 6 agreement was "subject to the completion of due diligence and negotiation of definitive agreements."[194]   Sterling took the next five weeks to complete diligence and analyze the potential deal.[195]

On July 13, 2017, Sandler presented its fairness opinion for the Berkeley Point acquisition and reasonableness opinion for the CMBS investment to the Special Committee.[196]  It concluded that the Berkeley Point acquisition was fair to BGC and that the terms of the CMBS investment were reasonable.[197]

Sandler's presentation included slides comparing the implied multiples for the Berkeley Point acquisition to market multiples of a number of companies, focusing in particular on Walker & Dunlop, a real estate finance company with a business "very comparable to Berkeley Point."[198]   Sandler opined that the comparison demonstrated that a price of $875 million for Berkeley Point was "well within [the] imputed valuations."[199]

---

[194] JX 570.

[195] JX 658; JX 659.

[196] JX 658; JX 659; JX 663.

[197] PTO ¶ 106; JX 658; JX 659.

[198] JX 663 at 19-20; Strassberg Dep. 314.

[199] JX 663 at 21; Sterling Tr. 284-85.

Sandler did not conduct a comparable transactions analysis or a discounted cash flow analysis. With respect to the former, Sterling testified that Sandler could not find a comparable transaction with publicly available metrics.[200] As to the latter, Sterling explained that a discounted cash flow analysis was not useful in valuing real estate finance companies.[201]

In terms of the $100 million CMBS investment, Sandler opined that it was reasonable after reviewing various scenarios surrounding the investment's potential returns and comparing the investment's terms to comparable secured debt offerings.[202] Sandler observed that although comparable market offerings had yields to maturity of 2-5%, BGC was effectively "getting a [set] 5% coupon" along with other upside.[203]

That same day, the Special Committee unanimously resolved that the transaction was in the best interest of BGC and recommended to the Board that it approve the Transaction.[204] On July 16, the Board adopted the Special Committee's

---

[200] Sterling Tr. 396.

[201] *Id.* at 395.

[202] JX 663 at 2, 23-25.

[203] *Id.* at 24; Sterling Tr. 286-87.

[204] PTO ¶ 107.

recommendation and voted to approve the transaction.[205]    The transaction agreements were executed the next day.[206]

## P.    Deal Announcement and Closing

On July 18, 2017, BGC publicly disclosed the transaction.[207]  Its press release included projections of Berkeley Point's 2017 and 2018 revenues, pre-tax GAAP income, and adjusted pre-tax income.  On July 21, BGC filed a Form 8-K with the Securities and Exchange Commission that included the transaction agreements.[208]

The Berkeley Point acquisition and CMBS investment closed on September 8, 2017.[209]  Cantor invested about $267 million into the CMBS business alongside BGC.[210]  That same day—prior to closing—Berkeley Point paid CCRE roughly $66.8 million in order to adjust its estimated GAAP equity back to its value as of March 31, 2017, as required by the transaction agreement's terms.[211]  Similarly, BGC paid Cantor an additional $22.4 million true-up in November 2017.[212]

---

[205] *Id.* ¶ 108.

[206] *Id.* ¶ 109.

[207] *Id.* ¶ 110.  The press release noted that the total consideration for Berkeley Point was $875 million and that Berkeley Point would be purchased at a book value of approximately $509 million. JX 685.  It also stated that BGC would invest $100 million for roughly 27% of CCRE's CMBS business.  *Id.*

[208] PTO ¶ 111.

[209] *Id.* ¶ 114.

[210] Lutnick Tr. 1289-91; JX 916 ("Hubbard Opening Report") at 64.

[211] PTO ¶ 113; JX 739.

[212] PTO ¶ 115; *see* JX 750.

## Q. Procedural History

On October 5, 2018 and November 5, 2019, respectively, plaintiffs Roofers Local 149 Pension Fund and Northern California Pipe Trades Trust Funds—both BGC stockholders—filed verified stockholder derivative complaints against Lutnick, Bell, Curwood, Moran, Dalton, CFGM, and Cantor.[213] The actions were consolidated on December 4, 2018.[214] The plaintiffs filed the operative Amended Verified Stockholder Derivative Complaint on February 12, 2019.[215]

The Complaint alleges that the Cantor Defendants (in their capacity as controlling stockholders of BGC) and Lutnick (in his capacity as an officer and director) breached their fiduciary duties by causing BGC to enter into the transaction to their gain and BGC stockholders' detriment.[216] The Special Committee members—Moran, Bell, Curwood, and Dalton—were also charged with breaching their fiduciary duties.[217]

On March 19, 2019, the Special Committee defendants and the Cantor Defendants filed separate motions to dismiss pursuant to Court of Chancery Rules

---

[213] Dkt. 1; PTO ¶¶ 4-5; *see* Dkt. 6.

[214] PTO ¶ 6.

[215] *Id.*

[216] Am. Compl. ¶¶ 140-148.

[217] *Id.* ¶¶ 136-138.

23.1 and 12(b)(6).[218]  Chancellor Bouchard denied the motions on September 30, 2019.[219]

On February 10, 2021, the Special Committee defendants and the Cantor Defendants moved for summary judgment.[220]  On April 20, 2021, the plaintiffs voluntarily dismissed the claims against Dalton with prejudice.[221]

After the case was transferred to me upon Chancellor Bouchard's retirement from the bench, I granted in part and denied in part the director defendants' motion and denied the Cantor Defendants' motion.[222]  Specifically, summary judgment was entered in Bell and Curwood's favor but otherwise denied.

Trial was held from October 11 to October 15, 2021.[223]  Post-trial arguments took place on March 2, 2022.[224]

Following post-trial argument, I requested supplemental briefing on matters related to the valuation of Berkeley Point.[225]  The parties' supplemental submissions

---

[218] PTO ¶ 8.

[219] *In re BGC P'rs, Inc. Deriv. Litig.*, 2019 WL 4745121, at *1 (Del. Ch. Sept. 30, 2019).

[220] PTO ¶ 16.

[221] *Id.* ¶ 17.

[222] *In re BGC P'rs, Inc. Deriv. Litig.*, 2021 WL 4271788, at *10 (Del. Ch. Sept. 20, 2021).

[223] Dkt. 252.

[224] Dkt. 278.

[225] Dkt. 280.  The plaintiffs Cantor Defendants were asked to address issues related to whether Berkeley Point's GAAP net income required adjustment in the context of their experts' valuation models. *Id.*

38

were filed on May 13, 2022.[226]  The case was deemed submitted for decision as of that date.

## II.    LEGAL CONCLUSIONS

Derivative breach of fiduciary duty claims against the Cantor Defendants and Moran remain post trial.  I begin by considering the question of whether the demand requirement was excused.  I then address the claims against the Cantor Defendants, which I assess under the entire fairness standard of review, and the claim against Moran.

### A.    Demand Futility

Demand futility is a fundamental issue in derivative litigation.  It flows from a core tenet of Delaware corporate law: "[t]he decision whether to initiate or pursue a lawsuit on behalf of the corporation is generally within the power and responsibility of the board of directors."[227]  As a threshold question, it is often litigated in connection with the procedural requirements of Court of Chancery Rule 23.1 at the pleading stage.  Still, demand futility can remain as an issue to be litigated later in the case.[228]  That is the situation here.

---

[226] Dkts. 283, 284.

[227] *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 120 (Del. Ch. 2009); *see* 8 *Del. C.* § 141(a).

[228] *See In re BGC P'rs*, 2021 WL 4271788, at *5-6; *see Rales v. Blasband*, 634 A.2d 927, 932 (Del. 1993) (noting that Rule 23.1 "constitutes the procedural embodiment" of a "substantive principle of corporation law").

At the summary judgment stage, I dismissed Bell and Curwood due to a dearth of evidence supporting a non-exculpated claim against them. Given remaining issues of material fact regarding Curwood and Moran's independence and Moran's potential liability, however, the Cantor Defendants' motion for summary judgment on the basis of demand futility was denied.[229] The defendants ask me to reconsider that conclusion with the benefit of the evidence presented at trial. If I find either Curwood or Moran to be disinterested and independent, they maintain I must hold that the demand requirement was not excused and rule in the defendants' favor.

A director is disqualified from exercising judgment about a litigation demand if she "lacks independence from someone who received a material personal benefit from the alleged misconduct that would be the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand."[230] Facts pertaining to a director's independence are considered in their totality.[231] An independent director may also be disqualified

---

[229] Moran, Curwood, and Lutnick formed a majority of the demand board. *See In re Zimmer Biomet Hldgs., Inc. Deriv. Litig.*, 2021 WL 3779155, at *10 (Del. Ch. Aug. 25, 2021) (explaining that the court "counts heads" to determine whether a majority of a board's members could have impartially considered a demand), *aff'd*, 2022 WL 2165342 (Del. June 16, 2022) (ORDER).

[230] *United Food & Com. Workers Union v. Zuckerberg*, 262 A.3d 1034, 1059 (Del. 2021).

[231] *See, e.g.*, *In re Oracle Corp. Deriv. Litig.*, 824 A.2d 917, 937 (Del. Ch. 2003); *Marchand v. Barnhill*, 212 A.3d 805, 818 (Del. 2019) (noting that "things other than money, such as 'love, friendship, and collegiality'" can be considered (quoting *In re Oracle*, 824 A.2d at 938)); *Del. Cty. Empls. Ret. Fund v. Sanchez*, 124 A.3d 1017, 1019

40

when faced with "a substantial likelihood of liability on any of the claims that would be the subject of the litigation demand."[232]

The plaintiffs acknowledge that they had the burden of proving demand futility at trial.[233] They say they met that burden because the record demonstrates that Curwood and Moran not only lacked independence from Lutnick but also faced a substantial likelihood of liability. On the latter point, the plaintiffs argue that Curwood and Moran are not disinterested because the claims against them survived a motion to dismiss and, in Moran's case, a motion for summary judgment.[234]

The parties have cited no case where the court ruled for the defendants at trial because demand was not excused (and I am aware of none). In the usual course, the plaintiffs are right. Yet I am not as sanguine as the plaintiffs that a claim surviving the pleadings stage is the final word on demand futility for the remainder of the action. One can imagine a situation where, for example, claims survived a motion to dismiss based on allegations in a complaint that proved baseless after discovery. In that scenario, why should the defendant be barred from asking the court to revisit

---

(Del. 2015) (explaining that a demand futility analysis considers alleged facts "in their totality and not in isolation from each other").

[232] *Zuckerberg*, 262 A.3d at 1059.

[233] Post-trial Hr'g Tr. March 2, 2022, at 97 (Dkt. 279).

[234] Pls.' Post-trial Br. 104, 107 (Dkt. 268). The plaintiffs also assert that "Bell was incapable of considering a demand." Pls.' Post-trial Br. 104 n.476. The law of the case held otherwise. *In re BGC P'rs*, 2021 WL 4271788, at *7-8.

demand excusal with the benefit of a developed record?  The defendant surely did not face a substantial likelihood of liability in that scenario.

This is, however, not such a case.  The needle did not move meaningfully on the question of demand futility between summary judgment and trial.  I find that Curwood could not have impartially considered a demand to sue Lutnick.  Though the plaintiffs have not met their burden of showing that Moran lacked independence, I conclude that he faced a substantial likelihood of liability on claims that would have been implicated in a hypothetical litigation demand.  Consistent with earlier decisions in this case, I hold that demand was excused.

### 1.    Stephen Curwood

The plaintiffs contend that Curwood could not have impartially considered whether to authorize a lawsuit against Lutnick because he is financially dependent on Lutnick.[235]  Curwood's service on the BGC Board provided him with more than half of his household income from 2010 to 2017.[236]

The defendants assert that Curwood's personal beliefs "push[] him 'towards simplicity'" while noting that he has sizeable pensions and owns properties in Maine, New Hampshire, and South Africa.[237]  They maintain that Curwood is

---

[235] Pls.' Post-trial Br. 107.

[236] PTO ¶ 45.  The portion of his annual income attributable to his Board position steadily increased from 47% to 64% from 2014 to 2017.  *Id.*

[237] Cantor Defs.' Post-trial Br. 3-4 (Dkt. 265).

independent regardless of the relative importance of his BGC income because he could have pursued other avenues of work.[238] I do not doubt that is true. But I cannot conclude that Curwood's desire to continue in his role as a BGC director would not have clouded his judgment had he been faced with a demand to sue Lutnick for breach of fiduciary duty.

"[T]he existence of some financial ties between the interested party and the director, without more, is not disqualifying."[239] The question is "whether, applying a subjective standard, those [financial] ties were *material*, in the sense that the alleged ties could have affected the impartiality of the individual director."[240] Even then, the court has rightly questioned whether a director should be viewed as dominated by another fiduciary "merely because of the relatively substantial compensation provided by the board membership compared to their outside salaries."[241]

---

[238] *See* Moran Post-trial Br. 58 (Dkt. 265).

[239] *Kahn v. M & F Worldwide Corp.*, 88 A.3d 635, 649 (Del. 2014), *overruled on other grounds by Flood v. Synutra Int'l, Inc.*, 195 A.3d 754 (Del. 2018).

[240] *Kahn*, 88 A.3d at 649.

[241] *In re Walt Disney Co. Deriv. Litig.*, 731 A.2d 342, 360 (Del. Ch. 1998) (explaining that to find otherwise would "discourage the membership on corporate boards of people of less-than extraordinary means" because "[s]uch 'regular folks' would face allegations of being dominated by other board members"); *see Chester Cty. Empls' Ret. Fund v. New Residential Inv. Corp.*, 2017 WL 4461131, at *8 (Del. Ch. Oct. 6, 2017); *In re BGC P'rs*, 2021 WL 4271788, at *8 (recognizing "the public policy concerns at play when wealth is used as a factor in analyzing independence").

The factors that lead me to conclude that Curwood is not independent for demand futility purposes are not a mere matter of dollars. My analysis is not driven solely by rote assessment of a percentage of one's director fees relative to other income. Rather, I look to subjective factors to assess how Curwood might behave based upon the information I have about him.[242]

In his deposition testimony, Curwood acknowledged that he "was grateful that [the director position] would allow [him] to both feed [his] family and [continue his career in] public radio."[243] That testimony was confirmed at trial.[244] The plaintiffs presented evidence that Curwood viewed Lutnick and the opportunity Lutnick gave him "to serve on his board and to make the money that [Curwood] needed to support [his] family for the last three years" as a "blessing."[245]

"It is difficult to imagine more personally motivating factors" than supporting one's family and pursuing one's passions.[246] These are among the most important things in life and, to my mind, would likely bear on one's decision-making. That is

---

[242] *Oracle*, 824 A.2d at 942 (discussing the so-called "subjective 'actual person' standard'" (quoting *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1167 (Del. 1995))).

[243] Curwood Dep. 124.

[244] Curwood Tr. 773-74.

[245] JX 66.

[246] *In re BGC P'rs*, 2021 WL 4271788, at *8; *see In re Student Loan Corp. Deriv. Litig.*, 2002 WL 75479, at *3 n.3 (Del. Ch. Jan. 8, 2002) (describing the renumeration "by which bills get paid, health insurance is affordably procured, children's educations are funded, and retirement savings are accumulated" as "typically of great consequence" to the recipient).

not to critique Curwood, whose strength of character is obvious. It is a matter of human nature coupled with the lack of precision inherent in assessing how one might respond to a demand that was never, in fact, made.[247]

Curwood understood that Lutnick had the power to remove him from his position on the Board.[248] In view of the stability and personal freedom that his Board position created, I conclude that Curwood's partiality would likely have been impaired had he been asked to accuse Lutnick of breaching his fiduciary duties and to authorize litigation against him.

It must be emphasized that this conclusion does not resolve the question of whether there is sufficient evidence that Curwood lacked independence from Lutnick during the Special Committee's negotiations with Cantor. As the court explained in *Sciabacucchi v. Liberty Broadband Corporation*, there are meaningful distinctions between an independence inquiry in the contexts of a special litigation committee, demand futility, and with respect to voting on a deal or corporate

---

[247] *See Del. Cty. Empls. Ret. Fund v. Sanchez*, 124 A.3d 1017, 1020-21 (Del. 2015) (considering whether director compensation was material where it allegedly constituted 30% to 40% of defendant's total annual income as part of a holistic analysis of "[h]uman relationships"); *In re Oracle*, 824 A.2d at 938 (noting that although "Delaware law should not be based on a reductionist view of human nature that simplifies human motivations on the lines of the least sophisticated notions of the law and economics movement," it should not "ignore the social nature of humans").

[248] Curwood Dep. 119-21.

governance matter.[249]   The lens through which I analyze the evidence differs between demand futility and the ultimate claims about the transaction.  The latter is addressed later in this decision.[250]

## 2.    William Moran

At summary judgment, I found that Moran does not rely on his BGC Board compensation and lacks close social or other ties to Lutnick that would call his independence into question.[251]  No new evidence was introduced that causes me to reconsider that view.  In terms of Moran's independence, the remaining question for trial was whether his admiration for Lutnick would sterilize his discretion if faced with a demand.

The plaintiffs had argued earlier in this case that Moran's "teary-eyed" deposition testimony about his respect for Lutnick casts doubt on Moran's ability to consider a demand to sue him.[252]  Stripped of the inference favoring their position and with the burden of proof upon them, the plaintiffs' argument falls flat.  I am convinced that Moran's emotional testimony was driven by his own connection to

---

[249] 2022 WL 1301859, at *14 (Del. Ch. May 2, 2022).

[250] *See infra* Section II.B.1.b.i.

[251] *See In re BGC P'rs*, 2021 WL 4271788, at *9 (noting that Moran earns a pension of roughly a million dollars a year from his past employer and has a net worth of nearly $20 million).

[252] *See In re BGC P'rs*, 2021 WL 4271788, at *9 (quoting Moran Dep. 86, 99).

the 9/11 tragedy.[253]  Nothing in the record suggests that Moran's respect for Lutnick was so personal or of such a "bias producing" nature that it would have clouded Moran's judgment were he asked to sue Lutnick.[254]

After trial, the plaintiffs also argue that Moran should not be viewed as independent for demand futility purposes due to evidence that he failed to act independently during the deal process.[255]  As I address later in this decision in greater detail, some of Moran's actions during negotiations raise questions.  Moran, at times, lost his place and had interactions with Lutnick that are far from ideal.  But when it came to substantive negotiations, Moran consistently advocated to achieve the best deal for the minority stockholders—even when it was not the deal Lutnick desired.[256]

Under these circumstances, I cannot find that Moran would have been disabled from assessing a demand to sue Lutnick because of a lack of independence.

---

[253] Moran Tr. 875-76.

[254] *See Beam v. Stewart*, 845 A.2d 1040, 1050 (Del. 2004).  For example, the plaintiffs relied on the fact that Moran's partner kept a picture of herself, Lutnick, and Moran on her shelf.  They also point out that Lutnick arranged for Moran and his partner to enjoy a private tour of the Tate Modern in London.  This may evidence a friendship of sorts—but hardly one that is bias producing.  *See In re Kraft Heinz Co. Deriv. Litig.*, 2012 WL 6012632, at *10 (Del. Ch. Dec. 15, 2021) ("Allegations that individuals 'moved in the same social circles,' 'developed business relationships before joining the board,' or described each other as 'friends' are insufficient, without more, to rebut the presumption of independence." (quoting *Beam*, 845 A.2d at 1051)), *aff'd*, 2022 WL 3022353 (Del. Aug. 1, 2022) (TABLE).

[255] Pls.' Post-trial Br. 107.

[256] *See infra* Section II.B.1.b.i.

He does not have a close personal relationship to Lutnick; they are business acquaintances.[257] He is not financially dependent on Lutnick. And he was unafraid to "tangle[]" with Lutnick when it became necessary.[258]

I nonetheless conclude that Moran could not have impartially considered a demand because he faced a substantial likelihood of liability on certain claims that would have been the subject of the demand. Moran was—despite moving for dismissal and for summary judgment—a defendant at a trial on whether he breached his duty of loyalty. Though Moran is ultimately adjudged not liable for a non-exculpated claim, this case's record proves that the claim easily "ha[d] some merit."[259] It is reasonable to think that Moran would have paused on whether he could authorize a suit against Lutnick concerning the Berkeley Point deal given some of Moran's peculiar behavior during the deal process.

## B. Entire Fairness

"When a transaction involving self-dealing by a controlling shareholder is challenged, the applicable standard of judicial review is entire fairness."[260] It is

---

[257] Moran Tr. 805.

[258] Moran Dep. 55-57.

[259] *In re CBS Corp. S'holder Deriv. Litig.*, 2021 WL 268779, at *31 (Del. Ch. Jan. 27, 2021), *as corrected* (Feb. 4, 2021) (quoting *United Food & Com. Workers Union v. Zuckerberg*, 2020 WL 6266162, at *16 (Del. Ch. Oct. 26, 2020), *aff'd*, 262 A.3d 1034 (Del. 2021)).

[260] *Ams. Mining Corp. v. Theriault*, 51 A.3d 1213, 1239 (Del. 2012); *see Kahn v. Tremont Corp.*, 694 A.2d 422, 428 n.3 (Del. 1997).

undisputed that Lutnick (and the other Cantor Defendants) stood on both sides of the transaction. Given his relative ownership of Berkeley Point and BGC (54% and 23% respectively), Lutnick had an incentive to cause BGC to overpay for Berkeley Point.[261]

The seminal case of *Weinberger v. UOP, Inc.* pronounced that "[t]he concept of fairness has two basic aspects: fair dealing and fair price."[262] "In making a determination as to the entire fairness of a transaction, the Court does not focus on one component over the other, but examines all aspects of the issue as a whole."[263] The party bearing the burden of persuasion must establish "to the court's satisfaction that the transaction was the product of both fair dealing and fair price."[264]

The Cantor Defendants had the initial burden of proving that the transaction was entirely fair at trial.[265] In their summary judgment motion, the Cantor

---

[261] The Cantor Defendants argue that, because BGC represented Lutnick's "single most valuable asset in terms of his personal wealth," Lutnick had no economic incentive to cause it to overpay for Berkeley Point. *See* Cantor Defs.' Post-trial Br. 1-2. Not so. The incentives are driven by share of ownership, not absolute terms. If Lutnick owned 23% of BGC and 54% of Berkeley Point, Lutnick "earns" $0.31 for every dollar transferred from BGC to Berkeley Point. And if a market that initially views a deal as fair corrects for an overpayment in this type of scenario, the amount of the gain decreases—it is not negated.

[262] 457 A.2d 701, 711 (Del. 1983).

[263] *Bomarko, Inc. v. Int'l Telecharge, Inc.*, 794 A.2d 1161, 1180 (Del. Ch. 1999) (citing *Weinberger*, 457 A.2d at 711).

[264] *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993).

[265] That is, the breach of fiduciary duty claims against them are subject to the entire fairness standard of review and they will be found liable if they do not carry their burden under the standard.

49

Defendants advocated for a pre-trial burden shift under the *Lynch* doctrine, which provides that controlling stockholders may shift the burden of persuasion by "an approval of the transaction by an independent committee of directors."[266] Because I found genuine issues of material fact regarding the independence of a majority of the Special Committee, I held that the defendants were not entitled to a pre-trial determination on burden shifting.[267]

After trial, the defendants did not again ask to shift the burden of proving entire fairness to the plaintiffs.[268] I ultimately conclude, however, that the Special Committee was independent, fully empowered, and well-functioning, warranting a burden shift under the *Lynch* doctrine.[269] This determination does not affect my conclusions on entire fairness; the issue of fairness is not in equipoise.[270] Regardless of who has the burden, I conclude that the transaction was entirely fair to BGC and its minority stockholders.

---

[266] *Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1117 (Del. 1994).

[267] *In re BGC P'rs*, 2021 WL 4271788, at *10.

[268] *See* Post-trial Hr'g Tr. Mar. 2, 2022 at 62.

[269] *See Tremont*, 694 A.2d at 428-29.

[270] *In re S. Peru Copper Corp. S'holder Deriv. Litig.*, 52 A.3d 761, 793 (Del. Ch. 2011), *aff'd*, 51 A.3d 1213 (Del. 2012) ("[T]he burden becomes relevant only when a judge is rooted on the fence post and thus in equipoise."); *see In re Cysive, Inc. S'holders Litig.*, 836 A.2d 531, 548 (Del. Ch. 2003) (explaining that the "practical effect of the *Lynch* doctrine's burden shift is slight").

50

### 1. Fair Dealing

The *Weinberger* opinion explained that a consideration of fair dealing "embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors . . . were obtained."[271] The plaintiffs assert that the answers to these questions are indicative of an unfair process. Their argument goes as follows: Lutnick presented the transaction to the Board as a *fait accompli*; he dictated the deal timing and terms; he co-opted the Special Committee, which was ineffective; and he withheld valuation information. The defendants refute each point.

My fair dealing analysis identifies some defects in the process. Lutnick's presence loomed large at times. He had a hand in selecting the Special Committee's co-chairs and its advisors. Information was slow rolled to the Special Committee. Final negotiations unfolded over a compressed time period. But "[p]erfection is an unattainable standard that Delaware law does not require, even in a transaction with a controller."[272] Considering the evidence in its totality, I conclude that the process—albeit imperfect—was ultimately fair.

---

[271] *Weinberger*, 457 A.2d at 711; *Kahn v. Lynch Comm'cn Sys.*, 669 A.2d 79, 83 (Del. 1995).

[272] *Brinckerhoff v. Tex. E. Prod. Pipeline Co.*, 986 A.2d 370, 395 (Del. Ch. 2010); *see Cinerama*, 663 A.2d at 1179 (explaining that "perfection is not possible, or expected" in applying the entire fairness standard (quoting *Weinberger*, 457 A.2d at 709 n.7)).

I base that assessment on a review of the relevant *Weinberger* factors—timing and initiation, structure, negotiations and approval. The deal was not timed to benefit Cantor. At least a majority of the Special Committee members was independent throughout the negotiations. The Special Committee devoted substantial time to its work and retained independent advisors. And, after months of due diligence, a deal was reached following arm's length bargaining where the Special Committee obtained its desired structure and a favorable price.[273] Each of these factors supports a legal conclusion of fair dealing.

### a. Transaction Initiation and Timing

The timing and initiation of a transaction can evidence a lack of fair dealing where it favors the controller to the minority's detriment.[274] In this case, it is obvious that the deal was initiated by Lutnick. He first raised it with the Board in February 2017 after reaching agreements in principle to buy out CCRE's other investors.[275]

---

[273] *See Weinberger*, 457 A.2d at 709 n.7; *Kahn v. Lynch*, 638 A.2d at 1121; *Ams. Mining Corp.*, 51 A.3d at 1241.

[274] *Weinberger*, 457 A.2d at 711; *see Jedwab v. MGM Grand Hotels, Inc.*, 509 A.2d 584, 599 (Del. Ch. 1986) ("The timing of such a transaction, we have been authoritatively reminded, may be such as to constitute a breach of a fiduciary's duty to deal fairly with minority shareholders.").

[275] The plaintiffs suggest that this timing reveals the deal was a *fait accompli*. Pls.' Post-trial Br. 55. I disagree. Lutnick flatly rejected the notion that the Berkeley Point acquisition was needed to fund the buyout. Lutnick Dep. 29-30. Furthermore, the Special Committee approved the transaction only after months diligence, negotiations, and Cantor making concessions.

52

It is also apparent that Lutnick sought to drive the timeline. Lutnick initially hoped to reach a deal by the end of the first quarter.[276] The process was slowed in order to allow Cantor to assess its potential tax liability.[277] Lutnick then "lit a fire" under the Special Committee once the tax analysis was complete.[278]

He was not successful. Despite Lutnick's prodding, the deal was not completed on any of the time frames he proposed. The final negotiations came together quickly but they followed several months of diligence and discussions between the Special Committee and its advisors, on one hand, and Cantor, on the other. And after the June 6 meeting where a deal was reached, the Special Committee took over a month to diligence the transaction and achieve a fairness opinion.[279]

Even if Lutnick had achieved his preferred timeline, "[m]ore must be shown . . . than that a majority shareholder controlled the timing of the transaction" to evidence a lack of fair dealing.[280] Parties to a transaction will typically have a preferred timeline. Expressing those preferences to a counterparty or slowing

---

[276] JX 1202.

[277] *See* JX 377.

[278] JX 423.

[279] JX 679; JX 681; JX 627; JX 683; JX 684.

[280] *Jedwab*, 509 A.2d at 599; *see Dieckman v. Regency GP LP*, 2021 WL 537325, at *27 (Del. Ch. Feb. 15, 2021) ("Controlling the timing of a merger is not sufficient by itself, however, to demonstrate unfair dealing by a controller.").

negotiations to carefully analyze a deal it is not evidence of unfair dealing. More often, it means that the timing of the transaction was itself the product of arm's length bargaining.

The record must, instead, demonstrate that the deal "as timed, financially injured the minority shareholders or enabled [the controller] to receive value at the minority's expense" to indicate unfairness.[281] Here, it does not. The Special Committee and Cantor agreed that if BGC was going to acquire Berkeley Point, it should do so in advance of the Newmark IPO scheduled for late 2017.[282] There is no suggestion that this timing disadvantaged BGC's minority stockholders.

b. Transaction Structure

Whether a transaction was structured to include procedural protections—such as requiring the approval of an independent board negotiating committee or a majority of the minority vote—is another important indicium of fairness.[283] Here, a

---

[281] *Van de Walle v. Unimation, Inc.*, 1991 WL 29303, at *12 (Del. Ch. Mar. 7, 1991) (finding a process fair where the controller dictated timing because "the defendants had a valid reason to believe that postponing a sale of Unimation would create a significant risk that any future sale would be at a much lower price"); *see In re Emerging Commc'ns, Inc. S'holders Litig.*, 2004 WL 1305745, at *32 (Del. Ch. May 3, 2004) ("Another circumstance that evidences the absence of fair dealing is where the transaction is timed in a manner that is financially disadvantageous to the stockholders and that enables the majority stockholder to gain correspondingly."); *Jedwab*, 509 A.2d at 599.

[282] Moran Tr. 889-90; Lutnick Tr. 1291-92; Bell Tr. 552-53.

[283] *See, e.g.*, *Gesoff*, 902 A.2d at 1145 ("The Supreme Court observed as early as *Weinberger* that the establishment of an independent special committee can serve as powerful evidence of fair dealing."); *Jedwab*, 509 A.2d at 599 ("As to the fact that the transaction was not structured to accord minority shareholders a veto, nor was an

fully empowered Special Committee of independent directors, advised by independent advisors, negotiated the transaction on BGC's behalf and voted to approve it.

### i. The Special Committee's Composition

"[A]n independent negotiating committee of [] outside directors" that deals with a controller at arm'sthe  length can evidence fair dealing.[284]  The special committee's composition is "of central importance" when evaluating the fairness of its process.[285]

Lutnick had a role in selecting the Special Committee's chairs.  He reached out to Moran almost immediately after proposing the deal to the Board and contacted Bell several weeks later to ask about their willingness to serve in the positions.  This is obviously not a process strength.  The misstep was, however, largely remedied after the Special Committee was fully empowered and voted to designate Bell and

---

independent board committee established to negotiate the apportionment of merger consideration on behalf of the minority, these are pertinent factors in assessing whether fairness was accorded to the minority."); *Sealy Mattress Co. of N.J. v. Sealy, Inc.*, 532 A.2d 1324, 1336 (Del. Ch. 1987) ("A second indicium of fair dealing, or its absence, is whether the process by which the merger terms were arrived at involved procedural protections that would have tended to assure a fair result.").

[284] *Weinberger*, 457 A.2d at 709 n.7.

[285] *Gesoff*, 902 A.2d at 1145-46.

Moran as co-chairs.[286] Lutnick did not attend the meeting where that vote occurred and there is no evidence that he influenced it.

Lutnick did not dictate the Special Committee's membership more broadly. All outside Board members—that is, BGC's directors other than Lutnick—were put on the Committee as a matter of course.[287] Moreover, at least a majority of its members were independent for purposes of a fair dealing analysis.

By the time trial began, two Committee members had been dismissed from this action. The plaintiffs conceded Dalton's independence.[288] And I found on summary judgment that Bell was both independent and had not acted to advance Lutnick's interests.[289]

Regarding Curwood, I explained earlier in this decision that I could not find him independent for purposes of demand futility. That conclusion concerned how Curwood might view a theoretical demand, which is not determinative of whether he was independent during real-world negotiations with Cantor. The two contexts

---

[286] JX 319; Bell Tr. 546; Moran Tr. 818. Witnesses at trial testified that Moran's leadership role was driven by his experience as the lead general auditor for JPMorgan Chase and "deep knowledge of the financial structures involved," his status as the chair of the Board's Audit Committee, his work ethic, and his availability given that he was retired. Bell Tr. 546; *see* Sterling Tr. 230-32. Bell was selected in great part due to her quantitative background. Moran Tr. 818; *see* Curwood Tr. 791.

[287] *See* Moran Dep. 174-75.

[288] *See In re BGC P'rs*, 2021 WL 4271788, at *4.

[289] *In re BGC P'rs*, 2021 WL 4271788, at *10.

necessarily require separate analyses.[290]  "[P]recedent recognizes that the nature of the decision at issue must be considered in determining whether a director is independent."[291]

"A director's objectivity concerning a hypothetical demand could be compromised even if her actions in evaluating a transaction were beyond reproach."[292]  That is so because it is more difficult for a director to decide a "fellow director has committed serious wrongdoing" and to sue him than to push back in negotiations over a conflicted transaction.[293]  Thus, "[s]uccessfully impugning a director's independence with respect to voting on transactions . . . should be more difficult than challenging the same independence with respect to assessing a demand."[294]

Curwood exemplifies this scenario.  The personal importance of his directorship could have colored his thinking had he been faced with a demand to accuse Lutnick of wrongdoing and pursue litigation against Lutnick.  But there is no evidence that Curwood lacked independence while negotiating against Lutnick about Berkeley Point and the CMBS investment.

---

[290] *See supra* notes 248-550 and accompanying text.

[291]  *Marchand*, 212 A.3d at 819.

[292] *In re BGC P'rs*, 2021 WL 4271788, at *10.

[293] *Id.* (quoting *Oracle*, 824 A.2d at 940).

[294] *Sciabacucchi*, 2022 WL 1301859, at *14.

Curwood credibly testified that he was committed to walking away from the deal if he felt the "finances" were "not appropriate" for BGC and its minority stockholders.[295] He emphasized that the loss of his Board seat was never a consideration during negotiations.[296] I have no basis to doubt that Curwood was independent—and acted independently—throughout the negotiations.[297]

That leaves Moran, who is the more complicated piece of the puzzle. My demand futility analysis led to the conclusion that Moran was independent of Lutnick (though unable to impartially considered a demand because he faced a substantial likelihood of liability through trial). Given that finding, there is little basis to question Moran's independence here insofar as he lacked meaningful ties to Lutnick. But during the deal process, Moran acted at times in a way that Bell acknowledged at trial was "not best practice."[298]

Moran agreed to act as the Special Committee's chair at Lutnick's request. He worked with Lutnick to identify advisors for the Special Committee (albeit before it was formally reestablished and fully empowered) and asked Lutnick whether

---

[295] Curwood Tr. 744, 746.

[296] Curwood Tr. 732-33.

[297] *See In re BGC P'rs*, 2021 WL 4271788, at *11 (explaining that the court must "assess the director's real-world actions (or inactions) in the context of her lack of independence"); *In re Oracle*, 824 A.2d at 940; *Marchand*, 212 A.3d at 820 & n.95; *see also Sciabacucchi*, 2022 WL 1301859, at *13-15.

[298] Bell Tr. 675.

Sandler would negotiate the deal price. He communicated with Lutnick about diligence and timing. He did not tell his fellow Special Committee members about those early interactions with Lutnick.[299] He indicated to Lutnick that the Committee supported the deal before Sandler had formed a view on value—albeit with the important caveat that the "price [be] right."[300] These instances of questionable behavior marred the deal process.

Yet, I cannot conclude that Moran was beholden to Lutnick or blinded by a "controlled mindset."[301] When it came to substantive negotiations, Moran pushed back firmly on Lutnick on multiple occasions. Sterling, for example, testified that it was Moran who told him to "go at [the negotiation with Cantor] hard" and "negotiate from . . . a zealous or aggressive standpoint on behalf of the independent directors and independent shareholders."[302] Moran told Lutnick that Cantor's proposals at the final negotiation were problematic and inconsistent with BGC's structural objectives, expressing his willingness to end the negotiations.[303] Though he provided confusing testimony about whether Lutnick could negotiate for himself,

---

[299] *See* Bell 663-64, 666.

[300] JX 509; Moran Tr. 955-56.

[301] *See In re S. Peru Copper*, 52 A.3d at 800 (finding that a special committee was ineffective for purposes of an entire fairness analysis where it "was trapped in the controlled mindset, where the only options to be considered are those proposed by the controlling stockholder").

[302] Sterling Tr. 263.

[303] *See* Moran Tr. 836-37, 843-44; Lutnick Tr. 1408-10.

the evidence shows that Moran knew his job was to advocate for the stockholders and that he was a positive force when it came to the ultimate price and terms reached.[304]

Moreover, there is no evidence that Moran jeopardized the substance of the Special Committee's independent process.[305] In *Van de Walle v. Unimation, Inc.*, then-Vice Chancellor Jacobs considered a scenario where one director allegedly labored under a disabling conflict that rendered the process unfair.[306] The court explained that even "assuming without deciding that [the director] had a disabling conflict of interest, there was no showing that his participation in the merger

---

[304] The plaintiffs highlight Moran's muddled deposition testimony that appeared to suggest Lutnick could negotiate for himself as both BGC and Cantor. Moran Dep. 160-61; *see* Moran Tr. 890. After hearing Moran's testimony at trial, I believe that Moran did not mean to say that Lutnick was permitted to negotiate on BGC's behalf against Cantor. Instead, it was a clumsy way of saying that Lutnick was on both sides of the deal. Moran Tr. 953-54; *see* Moran Dep. 161.

[305] The facts here are nothing like those in the cases plaintiffs rely on for their argument that Moran "infected" the process. Pls.' Post-trial Br. 67. In *In re Loral Space & Communications Inc.*, for example, a chair of a two-person committee maintained "important ties" with the controller and forwarded the controller an email from the committee's legal advisor "summarizing the Committee's discussion" of open issues "including its 'fall-back' position." 2008 WL 4293781, at *17 (Del. Ch. Sept. 19, 2008). Moran had no ties to Lutnick and there is no evidence he sent anything substantive about the Special Committee's negotiating strategy to Lutnick. In *Kahn v. Tremont*, a special committee chairman "conducted all negotiations over price and ancillary terms of the proposed purchase with [the controlling shareholder], and did so without the participation of the remaining two directors." 694 A.2d at 430. Here, Dalton, Bell, and Curwood consistently attended meetings, remained engaged, and were active participants in negotiations over the transaction price and terms.

[306] 1991 WL 29303, at *10-11.

negotiations and decision-making caused any actionable wrong or harm."[307]  The

conflicted director did not "dominate[] or control[] any of the remaining four

[directors]" or "otherwise influence[] the . . . board to act other than in the minority

stockholders' best interest."[308]  As in *Unimation*, Moran did not dominate the other

three Special Committee members or influence them to act against the interests of

BGC and its minority stockholders.[309]

ii.      The Special Committee's Advisors

"Another critical factor in assessing the reliability and independence of the

process employed by a special committee, is the committee's financial and legal

---

[307] *Id.* at *14.

[308] *Id.*

[309] The record also does not support the conclusion that Dalton, Bell, and Curwood fell victim to a controlled mindset.  Moran's counsel argues that the plaintiffs' allegations otherwise "cannot be squared with their *voluntary* dismissal of Dalton, or with the Court's finding that Bell is independent and Curwood did *not* act to advance the interests of Lutnick."  Moran Post-trial Reply Br. n.1.  I cannot credit that argument given that, in *Southern Peru*, the court found that the special committee's controlled mindset evidenced a lack of fair dealing despite the fact that the special committee members had been dismissed from the case at the summary judgment stage.  *See In re S. Peru Copper*, 52 A.3d at 785; *id.*, C.A. No. 961-VCS, at 123-29 (Del. Ch. Dec. 21, 2010) (TRANSCRIPT). Here, however, the evidence shows that Dalton, Bell, and Curwood engaged in arm's length negotiations to reach an optimal outcome for the minority stockholders. Unlike in *Southern Peru*, the Special Committee (including Moran) got "reasoned updates" from their financial advisor, obtained meaningful concessions from their counterparty, and pushed back on the controller's preferred approach. *See In re S. Peru Copper*, 52 A.3d at 773-74, 809-810. The Special Committee members' careful process and good faith pursuit of the minority stockholders' interests underpins my determination that the process was fair. *See Cinerama*, 663 A.2d at 1141 ("The overall judgment of fairness to shareholders that the court must make can, and in my opinion should, take into account the good faith of the directors when it considers the 'process' element of the evaluation.").

61

advisors and how they were selected."[310]  The plaintiffs do not dispute that Sandler

and Debevoise were qualified or that Debevoise is independent.  They question

Sandler's independence and point to Lutnick's role in selecting the Special

Committee's advisors as evidence of unfairness.[311]  By the time that the Special

Committee was reconstituted and empowered, Moran and Lutnick had already

discussed retaining Debevoise and had met with Sandler, negotiated the scope of its

role, and received a draft engagement letter.  This is a flaw in the process—Lutnick

should have had no involvement in selecting the Committee's advisors.

The court's decision in *Gesoff v. IIC Industries, Inc.* is instructive in assessing

the effect of Lutnick's involvement on the fairness of the process.[312]  There, a one-

person special committee had "no real authority" to choose his own advisors.[313]  A

legal advisor with a history of working with the conflicted board and controller was

"presented to [the director]" as the conflicted parties' choice, which the director

---

[310] *Kahn v. Dairy Mart Convenience Stores, Inc.*, 1996 WL 159628, n.6 (Del. Ch. Mar. 29, 1996).

[311] *See id.* (declining to shift the pre-trial burden of entire fairness because, among other things, the controlling stockholder's attorney had recommended the special committee's advisors); *Tremont*, 694 A.2d at 429 (questioning the propriety of the controlled entities' general counsel suggesting a legal advisor that had strong connections to the controlling stockholder, which the special committee promptly retained).

[312] 902 A.2d 1130 (Del. Ch. 2006).

[313] *Id.* at 1138.

accepted. The financial advisor, who had all but been promised the role by a conflicted executive, was also pressed upon the director.[314]

Here, unlike in *Gesoff*, the Special Committee members had the authority to choose their own advisors. After discussion and a unanimous vote (without Lutnick present), the Special Committee chose Sandler based (at least in part) on Moran, Curwood, and Dalton's prior work with and high regard for the firm.[315] Debevoise was likewise retained because Regner had worked with certain Committee members as a legal advisor in the past and they were confident in his abilities.[316]

There is an even greater distinction from *Gesoff*: the record demonstrates that Sandler (like Debevoise) was not conflicted.[317] Sandler's prior work for Lutnick-affiliated companies was overwhelmingly in representing special committees that were negotiating *against* Lutnick[318]—meaning that Sandler was not accountable to or hired by the Cantor Defendants.[319] There is also no evidence that Sandler's desire

---

[314] *Id.* at 1139.

[315] *See* Bell Tr. 547; Sterling Tr. 308-09.

[316] Bell Tr. 547-48.

[317] *Gesoff*, 902 A.2d at 1150-51 (detailing ways in which the special committee's financial advisor was "actively and persistently disloyal to the special committee and to its aims of assuring a fair transaction for [the company's] minority stockholders").

[318] Sterling Tr. 389-90.

[319] *See In re Cysive*, 836 A.2d at 554 ("Though the plaintiffs challenge the special committee's decision to engage Broadview, I do not perceive Broadview as having been conflicted due to their prior engagement working for Cysive to sell the company. In that role, Broadview was accountable to and was hired by Cysive's board.").

for a role in Newmark's IPO, which went only as far as a pair of emails in early February before it was hired by the Special Committee, impaired its independence. Ultimately, Sandler and Debevoise understood their roles and advocated on the Special Committee's behalf.

The record is devoid of evidence indicating that Lutnick benefitted from Sandler's retention or that BGC's minority stockholders were harmed. Sandler plainly advocated for the Special Committee against Cantor. For example, it, pressed Cantor for information that Cantor was initially hesitant to provide and questioned Cantor's changes to the deal structure. Most importantly, it bargained hard on the Special Committee's behalf—especially during the June 6 meeting.[320]

Thus, the retention of Sandler and Debevoise supports fair dealing—despite Lutnick's role in their retention. The advisors were qualified, independent, and not beholden to Cantor.[321]

---

[320] The plaintiffs also question Sandler's independence because it requested a $1 million fee that included a $350,000 contingent fee. Pls.' Post-trial Br. 58. "Contingency clauses are standard in financial advisor agreements and seldom create a conflict of interest." *In re Panera Bread Co.*, 2020 WL 506684, at *32 (Del. Ch. Jan. 31, 2020); *see In re Oracle Corp. Deriv. Litig.*, 2018 WL 1381331, at *14 (Del. Ch. Mar. 19, 2018).

[321] *See In re Tesla Motors, Inc. S'holder Litig.*, 2022 WL 1237185, at *34 n.413 (Del. Ch. Apr. 27, 2022) (finding that although the alleged controller "should not have been involved in the selection of counsel to advise the Tesla Board," the advisor chosen was "qualified, independent . . . [and] not beholden").

### c.  Transaction Negotiation and Approval

Under *Weinberger*, a fair dealing analysis includes how the transaction was negotiated and "how, and for what reasons, the approvals of the various directors themselves were obtained."[322] It is here that the strength of the Special Committee's process is most visible.

The Special Committee was well informed of the material facts when it voted to approve the transaction. During the three-month negotiation period, the Special Committee met at least nine times, with Sandler sharing three presentations containing information about Berkeley Point and the CMBS business.[323] The Committee members were "deeply engaged" and "very hardworking."[324] They exerted their bargaining power against Lutnick and prevailed in obtaining consequential concessions.

The plaintiffs argue otherwise on two principal grounds. First, they say that Lutnick and Cantor withheld material valuation information from the Special Committee that prevented it from negotiating effectively. Second, they argue that

---

[322] *In re Digex Inc. S'holders Litig.*, 789 A.2d 1176, 1207 (Del. Ch. 2000).

[323] JX 514; JX 528; JX 571; *see In re Cysive*, 836 A.2d at 554 (finding that a process was fair where the evidence showed each committee member "devoted substantial time to the committee's work" and "took its responsibilities seriously"); *In re MFW S'holders Litig.*, 67 A.3d 496, 499 (Del. Ch. 2013) (explaining that a special committee was effective where it "met eight times during the course of three months" and negotiated a price increase), *aff'd sub nom.*, *Kahn v. M & F Worldwide Corp.*, 88 A.3d 635 (Del. 2014).

[324] Sterling Tr. 262-63.

the Special Committee "acceded to Cantor's demands" rather than prevailed in negotiations.[325]  The evidence presented by the defendants critically undermines both positions.

### i.  Disclosure of Information

"[T]o make a special committee structure work it is necessary that a 'controlling stockholder . . . disclose fully all the material facts and circumstances surrounding the transaction.'"[326]  That includes the disclosure of (1) "all of the material terms of the proposed transaction," (2) "all material facts relating to the use or value of the assets in question," and (3) "all material facts which [the fiduciary] knows relating to the market value of the subject matter of the proposed transaction."[327]  The information must be disclosed fully and accurately.[328]

Some of the information that the Special Committee viewed as most important to its process—regarding the 2014 Berkeley Point transaction and the terms of the 2017 CCRE investor buyouts—was initially held back.  Had that information not made its way to the Special Committee, it might have evidenced a lack of fair

---

[325] Pls.' Post-trial Br. 48.

[326] *Kahn v. Tremont Corp.*, 1996 WL 145452, at *15 (Del. Ch. Mar. 21, 1996) (quoting *Lynch*, 669 A.2d at 88 (Del. 1995)), *rev'd on other grounds*, 694 A.2d 422 (Del. 1997).

[327] *Id.* at *16.

[328] *See In re Dole Food Co., Inc. S'holder Litig.*, 2015 WL 5052215, at *30 ("Implicit in the expectation that the controller disclose this information is . . . that the controller disclose it accurately and completely.").

dealing.  But, as the plaintiffs acknowledged after trial, Cantor eventually answered the Special Committee's repeated requests for it.[329]  Sterling testified that Sandler "[h]ad received all the information, had analyzed it, and had discussed it with the committee several times" before the parties engaged in face-to-face negotiations.[330]

The plaintiffs nonetheless assert that Lutnick and Cantor failed to satisfy their obligations to disclose complete and correct information to the Special Committee. That argument focuses on (1) Gosin, (2) Strassberg's projections, and (3) Cantor's tax information.

Gosin.  First, the plaintiffs claim that the Gosin's involvement skewed the Special Committee's perception of Berkeley Point's value because Lutnick told them that Gosin would provide BGC's thoughts on Berkeley Point's valuation and then coordinated with Gosin on what he would say.[331]  The record shows, however, that neither the Special Committee members nor Gosin felt that Gosin had been tasked with providing a quantitative assessment of Berkeley Point to the Committee.[332] He instead provided a qualitative view.  More generally, it is not clear

---

[329] Edelman Tr. 425-27; *see* JX 521.

[330] Sterling Tr. 219, 350; *see* Bell Tr. 559 (testifying that the Special Committee took the time they needed to "digest the diligence and understand the strategic rationale" of the transaction).

[331] Pls.' Post-trial Br. 60.

[332] Gosin Tr. 167-69 (noting that he would not have been the Newmark executive to handle the numbers); Bell Tr. 605-06.

how Gosin could have manipulated the Special Committee's views on Berkeley Point's value if he did not offer a view on valuation in the first place.

The plaintiffs call attention to the email Gosin received from Narasimhan opining on Berkeley Point's valuation in arguing that Gosin withheld crucial information from the Special Committee.[333] But I have no basis to attribute illicit motives to Gosin's decision to withhold the email from the Special Committee. Setting aside that his decision is not attributable to Cantor in any event, I believe that Gosin made the reasoned choice not to share it because he felt that it was unrealistic.[334]

Gosin testified (in response to my asking him why he failed to share the document) that Narasimhan's conclusions were unsound.[335] In particular, he questioned how the low end of Narasimhan's range ($426 million) could appropriately be below Berkeley Point's book value (which exceeded $500

---

[333] Pls.' Post-trial Br. 60. They also argue that Lutnick and Cantor prevented Narasimhan from participating in a "critical diligence meeting" because his correspondence indicated that he was joining a May Special Committee meeting and he did not show. JX 490. There is no evidence that Narasimhan was prevented from attending the meeting or uninvited. Gosin had no memory of inviting him. Gosin Tr. 1082-83.

[334] *See In re Cysive*, 836 A.3d at 554-55 (finding that a CFO's failure to turn over a revised budget to a special committee where he did not "place[] confidence" in the budget did not "materially impair the effectiveness of the negotiation and approval process because the document . . . did not contain any reliable information that would have changed the outcome of the committee's deliberations").

[335] Gosin Tr. 1096-97.

million).[336]   That testimony is unrebutted.   In fact, I have no evidence that would allow me to understand how Narasimhan reached his conclusions.  Narasimhan was not deposed and did not testify.[337]

Projections.   Second, the plaintiffs maintain that the projections prepared by Strassberg and considered by Sandler were manipulated.  That position does not hold up to scrutiny.  To start, Cantor never represented that the projections were prepared in the ordinary course; no existing projections for Berkeley Point were withheld from the Special Committee.[338]

The evidence indicates that Strassberg attempted to create two-year projections that he felt were "conservative" after gathering and analyzing the relevant information.[339]  The plaintiffs argue that aspects of Strassberg's efforts, such as hard-coding increases to certain metrics in his projections, prove otherwise.  But I do not attribute any ill intent to Strassberg's doing so—much less attribute these changes to Lutnick.

---

[336] *Id.*

[337] *See ACP Master, Ltd. v. Sprint Corp.*, 2017 WL 3421142, at *39 (Del. Ch. July 21, 2017) (rejecting "unsupported valuation" contained in "a single email" where there was "no evidence in the record as to how the [author] reached" his figures), *aff'd*, 184 A.3d 1291 (Del. 2018).

[338] *See In re Emerging Commc'ns*, 2004 WL 1305745, at *35.

[339] Strassberg Tr. 1124-25, 1133-34; *see supra* Section I.J.

Rather than demonstrate that Strassberg set out to mislead the Special Committee or inflate values he knew were unsupported, the evidence shows that the projections were his best estimate. Strassberg increased certain figures from his original projections after reviewing updated forecasts that projected net income for April and May significantly higher than that recorded in 2016. He forcefully rejected any notion that his projections were "misleading," "false," or "artificially inflated."[340] Nothing indicates that he increased projections based on Lutnick's say so. By all accounts, Berkeley Point's business is challenging to reliably project.[341]

Lutnick asked Strassberg to run a sensitivity analysis by varying the capture rate—the quantum of loan originations Berkeley Point could "capture" on ARA's investment sales. But Strassberg, who raised the idea of adjusting the capture rate up himself, planned to "vet the[] #s with the business."[342]

In short, this is not the stuff of doctored projections or fraud.[343]

---

[340] Strassberg Tr. 1150-51. Tied to plaintiffs' contention that Berkeley Point's projections were artificially inflated is the argument that the Cantor Defendants used their "superior" (*i.e.*, undisclosed) knowledge about Berkeley Point's performance in 2017 to raise the cost of the acquisition by setting Berkeley Point's book value as of March 31, 2017. *See* Pls.' Post-trial Br. 60-61. There is no reason that BGC should not have paid for Berkeley Point's growth between the set date and closing.

[341] *See infra* notes 417-19 and accompanying text. Sterling testified that Sandler understood that projections were of little use in the real estate finance sector. Sterling Tr. 289.

[342] JX 416.

[343] *Compare In re Dole*, 2015 WL 5052214, at *1, *31 (concluding that projections supplied by an officer described as the controller's "right-hand man" were "knowingly

70

Tax Information. The plaintiffs further argue that Lutnick failed to fulfill his disclosure obligations because he never turned over tax information supporting his $1 billion ask.[344] This has little bearing on my analysis because Cantor's tax information is not materially related to the value of Berkeley Point. It is only relevant to Cantor's consideration of the price at which it was willing to sell Berkeley Point. A controller is not required to disclose "information that relates only to its consideration of the price at which it will buy or sell and how it would finance a purchase or invest the proceeds of a sale."[345]

ii.      Arm's Length Negotiations

The most compelling evidence that the transaction resulted from a fair process is the Special Committee's achievement of a deal to acquire 100% of Berkeley Point—the structure it preferred and the Cantor Defendants disfavored. The plaintiffs refute that point, asserting that Lutnick abused his control to influence negotiations to Cantor's advantage. Despite some of Lutnick's early meddling, however, he appropriately separated himself from the Special Committee's process

---

false" and intentionally prepared to mislead a special committee for the controller's benefit).

[344] Pls.' Post-trial Br. 62.

[345] *In re Dole*, 2015 WL 5052214, at *29 (quoting *Tremont*, 1996 WL 145452, at *16), *rev'd on other grounds*, 694 A.2d 422 (Del. 1997)).

71

after it was reestablished and fully empowered.  There is no evidence that he failed to properly recuse himself from its substantive deliberations.[346]

That culmination of the Special Committee's process was the June 6 meeting. Before the meeting, the Committee had met numerous times, discussed the valuation "two or three times" with Sandler, and approved an advocacy presentation to persuade Cantor to lower its price.[347]  Bell, in particular, reviewed the numbers closely given her background as an economics professor.[348]

There are certainly questions surrounding how the parties' final negotiations on June 6 progressed from a structure whereby the BGC would invest in Berkeley Point to one where BGC purchased it outright.  The Special Committee's sole written counterproposal going into the meeting adopted the tax-efficient structure Cantor desired.  The minutes are no help; they speak of a Cantor counterproposal but do not specify what it was.[349]  No witness could remember the details.  This deficiency in

---

[346] The plaintiffs assert that Lutnick influenced the deal process by conversing with Sterling (once or twice) and attending certain Board and Audit Committee meetings during the negotiations.  Pls.' Post-trial Br. 26-27, 32-33; *see* JX 383; JX 400; JX 412; JX 476.  It appears from the minutes that Lutnick was sharing information with the Board and Audit Committee or interacting with the Special Committee as a counterparty—not involving himself in the Special Committee's process.  *See In re Tesla Motors*, 2022 WL 1237185, at *34-36 (finding fair process and discussing the controller's "apparent inability to acknowledge his clear conflict of interest and separate himself from Tesla's consideration of the Acquisition").

[347] Sterling Tr. 262-63.

[348] Sterling Tr. 298; Curwood Tr. 791; Moran Tr. 818.

[349] JX 570.

the record caused me to question how the deliberations unfolded. What is not in doubt, though, is the following.

First, the structure of the Berkeley Point acquisition clearly became the sticking point. The Special Committee members testified consistently and credibly that they became focused on an outright purchase of Berkeley Point during the course of the parties' negotiations.[350] The Committee's desire for that structure is consistent with Cantor entering the June 6 negotiations with two proposals: one for a purchase of 95% of Berkeley Point for $880 million and another for an outright purchase for $1 billion.[351] Cantor, of course, preferred the investment structure that benefitted its tax position.[352]

The Special Committee and Sandler bargained hard on the structure of the deal.[353] The negotiations became heated and required multiple sidebars to

---

[350] Sterling Tr. 220-222; Bell Tr. 569-70; Curwood Tr. 744-45; Moran Tr. 836-37.

[351] The $1 billion offer was never put in writing but was made after the Special Committee expressed its desire to buy 100% of Berkeley Point. *See* Edelman Tr. 433-35. Edelman testified that the Special Committee refused to accept Cantor's views on the $1 billion price, which Cantor felt would allow it to receive sufficient proceeds to "make it whole for the loss of the tax structuring." *See* Edelman Tr. 434-35; *see also id.* 524 (describing how the Special Committee team made clear to Cantor multiples times that taxes were "[their] problem").

[352] *See* Edelman Tr. 416-17.

[353] *In re Cysive*, 836 A.2d at 554 (explaining the "[m]ost important" aspect of fair dealing as the committee "[b]argain[ing] hard" with its counterpart).

73

progress.[354]  The Special Committee was prepared to walk away if Cantor did not agree to a deal that was attractive to the Committee.[355]  The Committee prevailed.[356]

Further, the Special Committee ended up with its preferred structure at a price in line with what Cantor had offered for 95% of Berkeley Point in its April and May term sheets.[357]  The plaintiffs maintain that the $875 million price for Berkeley Point was $150 million more than what Lutnick had discussed in February.[358]  But I cannot conclude that Lutnick's early mentions of a deal in the "mid 700s" or $725 million were true offers.[359]  The trial testimony consistently provides that those involved in the negotiations—including the Special Committee—felt otherwise.[360]  The documentary evidence is consistent with their understanding.  For example, Cantor's early modeling bracketed the figures in this range.

The plaintiffs also suggest that the negotiations moved backwards because the Special Committee's $720 million counteroffer was for 100% of Berkeley Point

---

[354] Sterling Tr. 269-71; Bell Tr. 570-72; Moran Tr. 943-45; *see Gesoff*, 902 A.2d at 1148 (explaining that "vigorous and spirited" negotiations are evidence of a fair process).

[355] Sterling Tr. 271-72; Moran Tr. 944-45; Curwood Tr. 744, 746.

[356] Sterling Tr. 405 (stating in response to the court's questions that, "at the very end" of negotiations, Cantor "conceded").

[357] JX 386; JX 503.

[358] Pls.' Post-trial Br. 64.

[359] *See* Lutnick Tr. 1274-75; *see* Edelman Tr. 411-12.

[360] Sterling Tr. 216-20; Edelman Tr. 411, 521-24; Bell Tr. 539-40; Moran Tr. 811-12 (describing the $700 million figure as "not a real number," less a "formal offer" than an "order of magnitude").

rather than 95%.[361] This contention is belied by the record. It is apparent from Sandler's June 5 presentation that it was considering $720 million for 95% of Berkeley Point.[362] The final deal price of $875 million is directly in line with what Sandler was advising the Committee: a 20% increase in value for the last 5% of Berkeley Point, full control, and liquidity. That outcome is persuasive evidence that the Berkeley Point acquisition resulted from a fair process.

In addition, the Special Committee successfully reduced the size of the CMBS investment from the $150 million Cantor proposed to $100 million. The Special Committee, advised by Sandler, concluded that an investment of this size would give BGC all the upsides it desired (such as data access) at a 33% savings.[363] The Special Committee also obtained more favorable terms for the investment than what Cantor had proposed. For example, Cantor agreed to the Special Committee's request for a "catch-up" provision under which BGC's following-years' returns would supplement any shortfall if its yearly return on the CMBS investment fell under 5%.[364]

\* \* \*

---

[361] *See* Pls.' Post-trial Br. 44.

[362] JX 566 at 10-11.

[363] *See* JX 566 at 13-14; Sterling Tr. 266-67; Edelman Tr. 443-44.

[364] JX 570.

Taken together, a consideration of the relevant *Weinberger* factors leads to the conclusion that the Berkeley Point acquisition and CMBS investment were the product of fair dealing. That is so regardless of which party bears the burden of persuasion. Nonetheless, I note that the Special Committee process was sufficient to merit a shift of the burden of proving unfairness to the plaintiffs under the *Lynch* doctrine.

### 2. Fair Price

Fair price "relate[s] to the economic and financial considerations of the [transaction], including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of [the asset]."[365] A fair price analysis can draw upon valuation techniques or methods that are generally recognized as acceptable in the financial community.[366] Although the economic inquiry in a fair price analysis is often equated to that applied under the appraisal statute, it is not a remedial calculation.[367] "[T]he court's task is not to pick

---

[365] *Weinberger*, 457 A.2d at 711.

[366] *See Weinberger*, 457 A.2d at 711, 713 (noting that a fair price analysis requires use of "techniques or methods which are generally considered acceptable in the financial community"); *Lynch*, 669 A.2d at 87-88 (discussing that a fair price analysis applies "recognized valuation standards"); *eBay Domestic Hldgs., Inc. v. Newmark*, 16 A.3d 1, 42 (Del. Ch. 2010) ("The analysis of price can draw on any valuation methods or techniques generally accepted in the financial community.").

[367] *See ACP Master*, 2017 WL 3421142, at *18; *Cede & Co. v. Technicolor, Inc.*, 2003 WL 23700218, at *2 (Del. Ch. Dec. 31, 2003) ("The value of a corporation is not a point on a line, but a range of reasonable values . . . ."), *aff'd in part, rev'd in part on other grounds*, 884 A.2d 26 (Del.2005); *see also Bershad v. Curtiss-Wright Corp.*, 535 A.2d 840,

a single number, but to determine whether the transaction price falls within a range of fairness."[368]

Because the entire fairness test is unitary, the court does not consider price in a vacuum. The fair price analysis gives "some degree of deference to fiduciaries who have acted properly" but does not operate as a "a rigid rule that permits controllers to impose barely fair transactions."[369] A fair process paired with an unfair price may therefore cause the court to conclude that defendants have breached their fiduciary duties.[370] "Price," however, is often "the paramount consideration because procedural aspects of the deal are circumstantial evidence of whether the price is fair."[371]

The evidence presented to address fair price centered on the parties' experts' opinions and Sandler's fairness opinion, which address both the Berkeley Point acquisition and the CMBS investment. I first assess whether the price paid for Berkeley Point is "a price that is within a range that reasonable men and women with

---

845 (Del. 1987) (explaining that fair price aspect of entire fairness standard "flow[s] from the statutory provisions . . . designed to ensure fair value by an appraisal, 8 *Del. C.* § 262"); *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 940 (Del. 1985).

[368] *In re Dole*, 2015 WL 5052214, at *33.

[369] *Reis vs. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 466 (Del. Ch. 2011).

[370] *See, e.g.*, *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 78 (Del. Ch. 2013) (noting, while making a finding of fair price, "the fact the directors did not follow a fair process does not constitute a separate breach of duty").

[371] *eBay,* 16 A.3d at 42; *see Ams. Mining Corp.*, 51 A.3d at 1244.

access to relevant information might [have paid]."[372] I go on to assess the fairness of the CMBS investment and find that it, too, was financially fair.

### a. The Berkeley Point Acquisition

The plaintiffs purchased Berkeley Point for $964.2 million in total: the $875 million initial deal price, a pre-closing $66.8 million adjustment to Berkeley Point's book value, and a $22.4 million true-up payment post-closing. The $875 million figure is the focus of my fairness analysis.[373] Naturally, the parties debate whether that price is fair.

The Cantor Defendants argue that the Special Committee's efforts and Sandler's analysis demonstrate the fairness of the $875 million BGC paid for Berkeley Point. They offer the expert opinion of Glenn Hubbard in support of that contention. Hubbard assessed the economic fairness of the Berkeley Point

---

[372] *Tremont*, 1996 WL 145452, at *1; *see Cinerama*, 663 A.2d at 1143 ("A fair price does not mean the highest price financeable or the highest price that fiduciary could afford to pay. At least in the non-self-dealing context, it means a price that is one that a reasonable seller, under all of the circumstances, would regard as within a range of fair value; one that such a seller could reasonably accept.").

[373] The plaintiffs stress that what they have termed an $89.2 million "dividend" (the final two payments BGC made for Berkeley Point) was an "unwitting concession" from the Special Committee. *See, e.g.*, Pls.' Post-trial Br. 48 & n.257. They do not contend, however, that damages should be assessed from the $964.2 million figure and both parties' experts evaluated the Berkeley Point acquisition against the $875 million price. D'Almeida Opening Report at 2; Hubbard Opening Report at 6. Moreover, I see no reason why BGC should not have had to pay for the value that Berkeley Point generated before closing. The Special Committee was aware that it had agreed to delivering Berkeley Point at closing with a book value as of March 31, 2017 and that significant increases in Berkeley Point's book value were projected for 2017. *See* JX 663 at 16-18; Curwood Tr. 783-84.

acquisition using an event study, a comparable company analysis, and a dividend discount model. From these analyses, Hubbard generated a Berkeley Point valuation range of $772 million to $1,489 million.[374]

The plaintiffs assert that, at the very least, the Special Committee should have paid no more than $725 million—a figure discussed early in negotiations. To buttress their position that the price was unfair, they offer the expert opinion of Jamie d'Almeida. D'Almeida conducted a guideline transaction analysis cross-checked with a study of the 2017 CCRE buyouts.[375] D'Almeida testified that the price BGC paid for Berkeley Point was nearly $300 million over its market value.[376]

The Cantor Defendants have the more persuasive argument when it comes to the fairness of the $875 million price. With respect to the low "$700 millions" price Lutnick raised when the transaction was first being contemplated, I have already found that it was not a true offer. Cantor's first proposal to the Special Committee was for $850 million for just 95% of Berkeley Point. The $875 million price agreed on for 100% of Berkeley Point came after months of arm's length negotiations. "The fact that a transaction price was forged in the crucible of objective market reality (as

---

[374] Hubbard Opening Report at 104.

[375] D'Almeida Opening Report at 49, 66.

[376] D'Almeida Tr. 1585.

79

distinguished from the unavoidably subjective thought process of a valuation expert) is viewed as strong evidence that the price is fair."[377]

The fairness of that $875 million price was also endorsed by Sandler in a detailed fairness opinion after more than a month of additional diligence.[378] Sandler analyzed the transaction using a variety of methods, including a comparison to Berkely Point's 2014 multiples and an analysis against Walker & Dunlop.[379] Looking at eight different Walker & Dunlop multiples, for example, Sandler found that seven of the eight were substantially higher than the equivalent Berkeley Point multiples implied by the deal price.[380]

The fairness of the acquisition price is further confirmed by a review of the expert opinions and testimony offered by each side. I begin by assessing each of Hubbard's three analyses. First, I view the event study as an indication that the market viewed the overall deal as well priced but attribute little weight to it as a measure of Berkeley Point's value. Second, I find that one of Hubbard's comparable companies analyses provides persuasive evidence that Berkeley Point's

---

[377] *Unimation*, 1991 WL 29303, at *17.

[378] *See, e.g. In re Tesla Motors*, 2022 WL 1237185, at *46 ("The fairness opinion is further evidence of fair price."); *Lynch*, 669 A.2d at 87-89 (affirming a finding of fair price based in part because of fairness opinions);

[379] JX 663; *see In re Sunbelt Beverage Corp. S'holder Litig.*, 2010 WL 26539, at *5 (Del. Ch. Jan. 5, 2010) (calling a fairness opinion a "mere afterthought" in part because it was "produced in approximately one week").

[380] JX 663 at 21.

value could have been as high as $942 million or $1,164 million. Third, I review and decline to attribute weight to Hubbard's dividend discount model.

After considering Hubbard's methods, I turn to d'Almeida's guideline transaction analysis, which is based on CCRE's 2014 acquisition of Berkeley Point. D'Almeida values Berkeley Point at $586 million by averaging four valuations generated by applying different multiples from the 2014 transaction to Berkeley Point in 2017.[381] He does not adjust any of the 2014 multiples.[382] I conclude that only one of the multiples—with adjustments—can provide an appropriate measure of Berkeley Point's value. That multiple indicates a value of $805 million for Berkeley Point.

The outcome of my assessment is that the evidence I find reliable supports a range of fair values for Berkeley Point of $805 million to $1,164 million. The $875 million acquisition price falls towards the lower end of that range. Thus, the price paid by BGC for Berkeley Point was economically fair.

---

[381] D'Almeida Opening Report at 116. This valuation assumes that BGC pays for future referrals. *See* [part discussing referrals]. The plaintiffs seek damages based on this valuation. Pls.' Post-trial Br. 70.

[382] D'Almeida Opening Report at 51-53.

## i. Hubbard's Event Study

The Cantor Defendants cite Hubbard's event study as a "particularly compelling evidence of a fair price."[383] Event studies are an "accepted method[] of analysis" in this court.[384] Of course, market evidence is only as good as the information that is known to the market.[385] The utility of an event study therefore depends whether all material information was disclosed to the market.[386]

Hubbard considered how BGC's stock price reacted to the announcement of the transaction, its closing, and related financial reporting—controlling for broader market and industry factors that would have simultaneously affected the stock price.[387] He concluded that there was an absence of "statistically significant stock price declines on both the announcement date and the closing date" that provide

---

[383] Cantor Defs.' Post-trial Br. 49.

[384] *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 745 (Del. Ch. 2005).

[385] *Applebaum v. Avaya, Inc.*, 812 A.2d 880, 890 (Del. 2002) (remarking that "a well-informed, liquid trading market will provide a measure of fair value").

[386] *See Bandera Master Fund LP v. Boardwalk Pipeline P'rs*, 2021 WL 5267734, at *83 (Del. Ch. Nov. 12, 2021) (rejecting reliance on market price where the market lacked material information); *Verition P'rs Master Fund Ltd. v. Aruba Networks, Inc.*, 210 A.3d 128, 139 (Del. 2019) (explaining it is inappropriate to rely on market price when there is "material, nonpublic information " that "could not have been baked into the public trading price).

[387] Hubbard Opening Report at 15. Hubbard also considered the possibility of the news being leaked between February 11, 2017 (when Lutnick first informed BGC's Audit Committee of a possible acquisition of Berkeley Point) and the transaction announcement date of July 18, 2017. *Id.* at 17-18.

evidence that BGC did not overpay for Berkeley Point.[388]  He explains that "[i]f BGC had overpaid for [Berkeley Point] . . . and public stockholders of BGC had the information necessary to independently assess the value of [Berkeley Point], then the stock price of BGC should [have] decline[d]" when the transaction was announced.[389]

The plaintiffs argue that the market did not have sufficient information to assess the transaction, making the market's reaction to the various events studied by Hubbard a poor indicator of value.  For example, they point to what they contend were unreliable projections included in the announcement of the transaction and the fact that the disclosures lacked historical data for Berkeley Point or the CMBS business.[390]  Still, much of this information was provided in the Form 8-K BGC filed when the acquisition was completed.

As the plaintiffs also note, however, the market was unaware that Berkeley Point did not create forecasts in the ordinary course or that the projections were prepared for purposes of the transaction's negotiations.[391]  More importantly, because the Berkeley Point acquisition and CMBS investment were announced

---

[388] *Id.* at 24.  In reaching that conclusion, Hubbard also established that BGC's stock trades in an efficient market.  *Id.* at 147-150.

[389] *Id.* at 20.

[390] JX 927 ("d'Almeida Rebuttal Report") at 33-66; *see* JX 685 at 4; JX 690.

[391] *See generally* JX 685; JX 690; JX 713.

together, it is difficult to separate out the market's reaction to each individually. Investors could hypothetically have viewed one as overpriced and the other as underpriced in a manner that cumulatively did not register as a statistically significant stock price reaction for the purposes of an event study.

Overall, the event study may be of some use in confirming that the market felt the overall transaction was favorable to BGC. But it is an imperfect method for assessing the value of Berkeley Point. I afford it little weight given the more reliable methods available.

### ii. Hubbard's Comparable Company Analysis

Hubbard also values Berkeley Point using a comparable company analysis. This is a standard valuation technique whereby financial ratios of public companies similar to the one being valued are applied to a subject company.[392]

Hubbard takes a trio of approaches. First, he conducts a comparable company analysis based on the eight companies Sandler considered. Second, he runs a regression on a broader range of companies in Berkeley Point's sector to estimate Berkeley Point's value. Third, he examines a single comparable: Walker &

---

[392] *See* Aswath Damodaran, *Investment Valuation: Tools and Techniques for Determining the Value of Any Asset* 38-39 (3d ed. 2012); Hubbard Opening Report at 49; *see Kleinwort Benson Ltd. v. Silgan Corp.*, 1995 WL 376911, at *4 (Del. Ch. June 15, 1995) (recognizing the reliability of comparable company analyses).

Dunlop.[393]  After considering each, I conclude that only the third provides a reliable assessment of Berkeley Point's value.

Sandler Peer Companies Analysis.  Hubbard starts by comparing Berkeley Point to a group of eight companies that he says were "identified by Sandler" as peers.[394]  He did not, however, further justify their use in his comparable company analysis.  Hubbard acknowledged at trial that he did not go "beyond whether [the companies] were in the other set[s] of comparables" to assess whether the companies in the comparable company analysis were good comparables.[395]  He did not, for instance, conduct an independent review of the comparable companies' fundamentals.[396]

Under these circumstances, the analysis cannot be relied upon.[397]  "For obvious reasons, market-based method[s] depend[] on actually having companies

---

[393] Hubbard Opening Report at 18-20.

[394] *Id.* at 52; *see* JX 554 at 8.  These same companies were considered in Cantor's internal documents analyzing the transaction. *See* JX 469 at 18.  It is unclear whether Sandler independently determined that the companies were good comparables for Berkeley Point or copied the list of companies from Cantor's materials. *See In re Jarden Corp.*, 2019 WL 3244085, at *33 (Del. Ch. July 19, 2019) (noting that "the financial literature advises against relying on peers provided by the target company's management"), *aff'd sub nom. Fir Tree Value Master Fund, LP v. Jarden Corp.*, 236 A.3d 313 (Del. 2020).

[395] Hubbard Tr. 1522.

[396] *See id.* 1521-23.

[397] *ONTI, Inc. v. Integra Bank*, 751 A.2d 904, 916 (Del. Ch. 1999) ("The burden of proof on the question whether the comparables are truly comparable lies with the party making that assertion . . . .").

that are sufficiently comparable that their trading multiples provide a relevant insight into the subject company's own growth prospects."[398] This court has observed that "[w]here an expert defers to a peer set without conduct a 'meaningful, independent assessment of comparability' between the seller's business and the business of its peer companies it 'is not useful and frankly, not credible.'"[399]

Regression-Based Analysis. The regression-based comparables analysis is also uninformative. Hubbard created a basic model by regressing price-to-book multiples on return on equity for companies within the "Thrifts and Mortgage Finance" industry.[400] As with the eight-company-set comparable analysis, Hubbard did not adequately justify the choice of companies that make it into the regression

---

[398] *In re Orchard Enters.*, 2012 WL 2923305, at *9 (Del. Ch. July 18, 2012).

[399] *In re Panera Bread*, 2020 WL 506684, at *42 (quoting *Jarden*, 2019 WL 3244085, at *34). The Cantor Defendants argue that the comparables provide valuable insight because "Hubbard's comparable companies are the same ones that market analysts identified as 'competitors'" to Newmark and Walker & Dunlop. Cantor Defs.' Post-trial Reply Br. 30. But a company can compete with another while being a poor comparable in terms of valuation. Notably, certain of the analyzed companies are multiple times larger than Berkeley Point. Others' values are derived largely from services different than those offered by Berkeley Point. *See* JX 554 at 8 (listing actual market capitalizations of comparables with several over two times—and one more than ten times—larger than Berkeley Point); Day Tr. (describing how three of the comparable companies relied much less on their GSE platform for revenue than Berkeley Point or Walker & Dunlop).

[400] Hubbard Tr. 1473-74.

analysis.[401] Furthermore, Hubbard's inaccurate calculation of Berkeley Point's return on equity calculation (discussed below) renders this analysis unreliable.[402]

Walker & Dunlop. That leaves Hubbard's comparable company analysis of Walker & Dunlop, which is free from the problems identified with the other two approaches.[403]

The plaintiffs emphasize that Berkeley Point differed from Walker & Dunlop in various ways. For example, Walker & Dunlop had a broader product mix, including a successful debt brokerage business.[404] Berkley Point was also more

---

[401] The Cantor Defendants mention the sector regression analysis only in passing in both their pre- and post-trial briefs. *See generally* Cantor Defs.' Pre-trial Br (Dkt. 244); Cantor Defs.' Post-trial Br.

[402] *See infra* Section II.B.2.iii (explaining Hubbard's double counting).

[403] This court has noted that a comparable company analysis may have limited value if only one comparable is used. *See, e.g.*, *Gray v. Cytokine Pharmasciences, Inc.*, 2002 WL 853549, at *9 (Del. Ch. Apr. 25, 2002); *In re AT&T Mobility Wireless Operations Hldgs. Appraisal Litig.*, 2013 WL 3865099, at *2 (Del. Ch. June 24, 2013) ("Where there is a lack of comparable companies, the analysis is not particularly meaningful and should not be used."); *Gholl v. Emachines, Inc.*, 2004 WL 2847865, at *6 (Del. Ch. Nov. 24, 2004) ("When a market analysis is based on only one 'comparable' company and yields such a wide range of results, the Court seriously questions its usefulness."). This is a circumstance where a single comparable generates meaningful evidence of value. *See In re AT&T*, 2013 WL 3865099, at *2 ("[C]ircumstances might be envisioned when a Court could rely on a single comparable . . . ."). The links between Berkeley Point and Walker & Dunlop were such that one would benchmark itself against the other and market analysts analyzed the acquisition by looking at Walker & Dunlop's multiples. *See infra* notes 407-11 and accompanying text.

[404] Strassberg Tr. 1225-27; *see* JX 1224 at 3.

reliant on GSE loans and generated less of its revenue from origination fees than Walker & Dunlop.[405]

But a comparable company analysis need not rely on perfectly comparable companies to be insightful. Rather, a party must establish some meaningful similarities between the entity at issue and the alleged comparable.[406] The evidence supports such a finding here.

There is general agreement between the parties that Walker & Dunlop was the closest public company comparable to Berkeley Point. Sandler compared Berkeley Point to Walker & Dunlop in depth,[407] d'Almeida stated that "Walker & Dunlop is the closest publicly traded company to Berkeley Point,"[408] and Berkeley Point's CEO agreed.[409] Strassberg—who had been the CFO of both Berkeley Point and Walker & Dunlop—described Walker & Dunlop's business model as "very comparable to Berkeley Point" and testified that Berkeley Point would benchmark

---

[405] D'Almeida Opening Report at 124.

[406] *See IQ Hldgs., Inv. v. Am. Comm. Lines Inc.*, 2013 WL 4056207, at *1-2 (Del. Ch. Mar. 18, 2013) (discussing "sufficient" and "insufficient" similarity when considering comparable company analyses).

[407] *See, e.g.*, JX 661 at 19-20.

[408] D'Almeida Opening Report at 54.

[409] Day Tr. 21-22.

itself against Walker & Dunlop.[410]  Market analysts also evaluated the Berkeley Point acquisition by comparing it to Walker & Dunlop.[411]

As of July 17, 2017, Walker & Dunlop was trading at a price-to-earnings multiple of 10.2x and a price-to-book multiple of 2.3x.[412]  Applying Walker & Dunlop's price-to-earnings and price-to-book multiples, respectively, leads to Berkeley Point valuations of $924 million and $1,164 million.[413]  I view those figures as reliable indicators of Berkeley Point's value at the time of the acquisition.

### iii.      Hubbard's Dividend Discount Model

Hubbard's final method of valuing Berkeley Point relies on a dividend discount model, which is a "simpler variant" of a discounted cash flow model ("DCF").[414]  Specifically, Hubbard uses a type of dividend discount model known

---

[410] Strassberg Tr. 1159-61; Strassberg Dep. 314.

[411] JX 686 at 2.

[412] Hubbard Opening Report at 53-54.  Although the financial data for both multiples is as of March 31, 2017 (the day to which the book value BGC had purchased for $875 million was pegged), the market data is as of July 17, 2017.  *Id.* at 53 n.176.  Hubbard's multiples are in line with those used in Sandler's fairness opinion, which considered market data as of July 12, 2017.  JX 661 at 20 (calculating a price-to-book multiple of 2.54 and price-to-earnings multiple of 11.5).

[413] *Id.* at 53-54, 96.  The multiple is as of March 31, 2017 (the day to which the book value BGC had purchased for $875 million was pegged).  The multiple in Sandler's fairness opinion, based on 2017 expected earnings per share, was 11.9x.  JX 661 at 20.

[414] Hubbard Opening Report 33; *see* Damodaran, *supra* note 392, at 324 ("[T]he Gordon growth model provides a simple approach to valuing equity, its use is limited to firms that are growing at a stable growth rate."); *DFC Glob. Corp. v. Muirfield Value P'rs, L.P.*, 172 A.3d 346, 379 (Del. 2017) (recognizing a Gordon Growth Model as an "appropriate tool" for valuation).

as a Gordon Growth Model ("GGM"). A GGM estimates the equity value of a company by assuming a dividend stream that grows in perpetuity at a stable rate and discounting back those cash flows at a given cost of equity.[415] Using the GGM, Hubbard valued Berkeley Point at a range of $1.159 billion to $1.489 billion.[416]

The GGM is unreliable evidence of Berkeley Point's fair value for several reasons. First, it is not a particularly dependable valuation methodology with respect to real estate finance companies.[417] An informative DCF valuation requires reliable projections. Preparing projections for companies in the real estate finance industry, though, is challenging because they rely on absolute and relative (to the past) interest rates. Sterling explained at trial that mortgage banking businesses like Berkeley Point are "almost entirely dependent on interest rate[s] and interest rate projections,"

---

[415] Hubbard Opening Report at 33.

[416] *Id.* at 104.

[417] D'Almeida Opening Report at 73-74 (describing a Bank of America analysis that mentions that DCF analysis is used only 6% of the time when valuation methodologies are used to value real estate services companies and 0% of the time when used to value real estate finance companies).

making a DCF analysis "of limited value."[418]  Moreover, as has been discussed, Berkeley Point lacked ordinary course projections.[419]

Various parties involved in the deal recognized a DCF analysis was not a useful tool to value Berkeley Point.  None of Berkley Point, Cantor, CCRE, BGC, or Sandler valued Berkeley Point using a DCF method.[420]  Even Hubbard acknowledged that companies in Berkeley Point's industry are not ideal subjects for a DCF analysis and indicated that other analyses might be more compelling.[421]

Second, dividend discount models are best suited for valuing businesses with "well-established dividend payout policies that they intend to continue into the future."[422]  Berkeley Point did not have a dividend payout policy or issue

---

[418] Sterling Tr. 289; *see* Sterling Tr. 395 ("When you try to project mortgage banking companies, they are inherently and ultimately almost entirely based on the shape and levels of the interest rate curve and where interest rates are in the future.  Those are very difficult to predict and end up being estimates."); Sterling Dep. 119-20 ("In the mortgage business[], projections have limited use, because the businesses are inherently tied to interest rates . . . these businesses are difficult to predict or project over the long term or even the near term because they're so dependent on not only absolute interest rates but movements in interest rates.  So in [a] mortgage banking business[] like th[is], [projections] are less applicable.").

[419] Hubbard Opening Report at 30 n.102; Strassberg Dep. at 124-25.

[420] *See* d'Almeida Opening Report at 74.

[421] Hubbard Tr. 1578-79.

[422] Damodaran, *supra* note 392, at 250; *see* Jerald E. Pinto et al., *Equity Asset Valuation* 134 (2d ed. 2010) ("A discounted dividend approach is most suitable for dividend-paying stocks in which the company has a discernible dividend policy that has an understandable relationship to the company's profitability . . . .").

dividends.[423]   Hubbard thus had to estimate Berkeley Point's capacity to pay a dividend.

Looking beyond the rather dubious applicability of the GGM to Berkeley Point, a consideration of the model's inputs reveals that it does not account for certain nuances of the mortgage loan origination and servicing business.  Three inputs make up Hubbard's GGM: a stable growth rate,[424] an expected dividend,[425] and cost of equity.[426]  Hubbard's calculation of Berkeley Point's return on equity is crucial to his GGM valuation—it is an input in the calculation of both the growth rate and the expected dividend.  He divided net income by book value to find Berkeley Point's return on equity in perpetuity.[427]

But the plaintiffs note that using net income rather than cash flows to calculate return on equity is problematic.  It has been recognized as "one of the most common mistakes" that valuation practitioners make because using net income can

---

[423] Hubbard Tr. 1551-52; d'Almeida Rebuttal Report at 30-31.

[424] The growth rate is equivalent to the product of a retention ratio (the share of earnings a company retains instead of paying out to stockholders) and return on equity.  Hubbard Opening Report at 34-35.

[425] The expected dividend is set equal to Berkeley Point's book value of equity multiplied by both its return on equity and Berkeley Point's payout ratio (one minus the retention ratio).  *Id.* at 34-35.

[426] Hubbard calculated the cost of equity using a standard capital asset pricing model.  *Id.* at 36-42.

[427] *Id.* at 82.

overestimate cash and, in turn, value.[428]    When it comes to Berkeley Point, d'Almeida argues that net income is an especially poor estimate of cash flow because its income statement includes a line item for "[g]ains from mortgage banking activities, net" (or mortgage service rights, "MSRs"), a non-cash item required to be included by general accepted accounting principles.[429]   After considering the issue and reviewing the parties' supplemental submissions addressing it, I agree.

MSRs are contractual agreements to service a mortgage.[430]   Cash from an MSR is received over its lifetime,[431] but GAAP requires the estimated present value of that future MSR income to be recognized as net income in the year the MSR is originated.[432]   The MSR is also recorded on the balance sheet as an asset that is amortized over its lifetime "in proportion to, and over the period of, the project net servicing income."[433]

Over the life of the MSR, the amortization equals to the estimated fair value of the MSR as debited on the balance sheet.   But it sums up to less than the servicing

---

[428] Shannon Pratt & Roger Grabowski, *Cost of Capital: Applications and Examples* 1189 (5th ed. 2014) (noting that net cash flow "usually is less than net income").

[429] D'Almeida Rebuttal Report at 19-20; *see, e.g.*, JX 713 at 304.

[430] Sterling Tr. 280; Hubbard Opening Report at 11-12.

[431] This is shown as "servicing fees" on the income statement.  *See, e.g.*, JX 713.

[432] D'Almeida Rebuttal Report at 19-20; d'Almeida Tr. 1612-15.

[433] JX 195 at 11.

income generated by the MSR.[434]  As a result, d'Almeida identified that Berkeley Point's unadjusted net income—that is, net income that includes MSRs and amortization—overstates its distributable income.[435]  In other words, Hubbard's inclusion of MSRs in Berkeley Point's net income resulted in "a measure of net income that is not truly reflective of income."[436]  The decision leads to a double counting of certain MSR income in Hubbard's GGM model.[437]  Hubbard's use of

---

[434] Pls.' Post-trial Suppl. Br. 6 (Dkt. 283); Cantor Defs.' Suppl. Br. 4 (Dkt. 284).

[435] D'Almeida Rebuttal at 10-14.  This is because of the discounted value of the MSR when it is put on the balance sheet—the amortization nets against servicing fees in future years at a discounted rate.  To take an overly simplified example, consider a MSR worth $10 in estimated servicing fees due in one year's time and a discount rate of 25%.  When the MSR is first registered as net income in year zero, it would be at the present value of $8.  In year one, those $8 would be amortized and $10 of servicing fee income would be recorded. The present value of the MSR is $8 (the payment in one year discounted back), not $9.60 (the $8 registered at year zero plus the $2 net income in year one discounted back).  Not removing MSRs and amortization from net income leads to overvaluation (just consider a second, identical MSR recorded at year one).  The Cantor Defendants effectively concede this point.  *See* Cantor Defs.' Suppl. Br. 4 ("Total amortization, however, does not necessarily converge to total *collected* servicing fees.").

[436] D'Almeida Rebuttal Report 20.

[437] The Cantor Defendants attempt to refute this view by arguing that, because Berkeley Point could sell its MSRs, they are effectively distributable cash.  Cantor Defs.' Post-trial Reply Br. 31-32; Cantor Defs.' Suppl. Br. 8-9.  As a result, they claim that no adjustments are necessary to Berkeley Point's net income to calculate a reliable return on equity.  *See* Hubbard Tr. 1498-99, 1556-57.  But selling MSRs in a given year would necessarily decrease servicing income in future years.  *See* Pls.' Suppl. Post-trial Br. 7.  It would also eventually lead to no amortization on the income statement.  In such a hypothetical scenario, Berkeley Point would eventually not receive any servicing income as MSRs from before the valuation year expired and MSRs were sold at their estimated present value every year.  It is not tenable to suggest that Berkeley Point could have repeated its net income (as calculated in the base year for Hubbard's GGM model) in perpetuity while selling its MSRs.

94

unadjusted net income to calculated return on equity correspondingly overstates Berkeley Point's return on equity.

Net income adjusting for MSRs and amortization is, instead, an appropriate way to understand Berkeley Point's operating earnings (and distributable cash). BGC itself adjusted GAAP net income to calculate Berkeley Point's distributable earnings and adjusted EBITDA following the acquisition.[438] Walker & Dunlop does the same.[439]

For all of these reasons, I decline to credit the GGM as evidence of fair value. The clarity it provides on how to assess Berkeley Point's adjusted net income, however, helps inform the following consideration of d'Almeida's analysis.

---

[438] JX 690 at 110, 113 ("BGC believes that distributable earnings best reflect the operating earnings generated by [Berkeley Point] on a consolidated basis and are the earnings which management considers available for, among other things, distribution to BGC Partners, Inc. and its common stockholders . . . ."); JX 988 at 22 (explaining that following the transaction, "BGC's calculation of [Berkeley Point's] pre-tax distributable earnings and adjusted EBITDA will exclude the net impact of [non-cash GAAP gains attributable to originated MSRs and non-cash GAAP amortization of MSRs]").

[439] *See* Cantor Defs.' Suppl. Br. 13-14; JX 814 at 47. Although the defendants are correct that both Berkeley Point and Walker & Dunlop note that these adjusted metrics are meant to supplement (rather than replace) GAAP net income as operating metrics, that point is unresponsive to the fact that Hubbard's GGM double counts distributable income. *See* JX 792 at 6; JX 814 at 47. It also does not address the fact that BGC believed distributable earnings (adjusted for MSRs and amortizations) "best reflect[ed]" money available to distribute to stockholders. JX 690 at 113-14.

iv.     D'Almeida's Guideline Transaction Analysis

The plaintiffs presented a single valuation approach: d'Almeida's analysis using the guideline transactions method. The method estimates the value of a business based on financial ratios from comparable transactions.[440] D'Almeida identified one transaction he concluded was an appropriately comparable: CCRE's 2014 acquisition of Berkeley Point.[441]

D'Almeida considered whether any adjustments to the multiples from the 2014 transaction were needed to value Berkeley Point in 2017. He concluded that they were not. For example, d'Almeida posits that Berkeley Point fared worse in 2017 than in 2014 in terms of fees earned per dollar of loans originated, origination fees as a share of origination volume, EBITDA margin, and risk (due to a relative shift away from safer GSE loans).[442]

---

[440] D'Almeida Opening Report at 49-50; *Highfields Cap., Ltd. v. AXA Fin., Inc.*, 939 A.2d 34, 54 (Del. Ch. 2007) (describing a comparable transactions analysis as "identifying similar transactions, quantifying those transactions through financial metrics, and then applying the metrics to the company at issue to ascertain a value").

[441] D'Almeida began his guideline transactions analysis by attempting to identify potential comparable transactions based on various criteria, resulting in a list of twenty transactions including CCRE's 2014 acquisition of Berkeley Point. Of the nineteen potential guideline transactions not involving the subject company, fifteen involved private target companies and, correspondingly, do not have publicly available metrics for analysis. Of the four remaining potential guideline transactions, d'Almeida excluded those transactions involving target companies not sufficiently similar to Berkeley Point. Following this last step, the 2014 CCRE-Berkeley Point deal was the sole transaction remaining. D'Almeida Opening Report at 50-51.

[442] *Id.* at 51-56. D'Almeida also claims that Berkeley Point would not receive as much of a boost to its loan origination volume from the acquisition when compared to its entry into

96

D'Almeida then selected four multiples from the 2014 transaction to estimate the value of Berkeley Point. Each of the four transaction multiples d'Almeida used was included in the materials Sandler prepared to aid the Special Committee's consideration of the 2017 transaction: two EBITDA multiples, a book value multiple, and a sector-specific multiple.[443] Applying these multiples results in an average Berkeley Point value of $586 million.[444]

The Cantor Defendants question the soundness of that valuation on several grounds. The threshold issue is that d'Almeida employed a single methodology. This court generally prefers that valuation experts employ multiple methodologies "to triangulate a value range."[445] But that is not necessarily a sufficient reason to set d'Almeida's valuation aside.[446]

---

a referral relationship with Newmark because the latter amounted to a greater shift. *Id.* at 53-54. And looking more generally at the real estate industry, d'Almeida claims that EV/EBITDA multiples fell over the relevant time period. d'Almeida Opening Report at 55-56. Specifically, d'Almeida looked at the industry classification of "Real Estate (Operations & Services) in a database maintained by New York University professor Aswath Damodaran. *See* Aswath Damodaran, *Enterprise Value Multiples by Sector (US)*, NYU STERN, https://pages.stern.nyu.edu/~adamodar/New_Home_Page/datafile/-vebitda.html (last updated Jan. 2022).

[443] D'Almeida Opening Report at 56.

[444] *Id.* at 116.

[445] *S. Muoio & Co. v. Hallmark Ent. Invs. Co.*, 2011 WL 863007, at *20 (Del. Ch. Mar. 9, 2011), *aff'd*, 35 A.3d 419 (Del. 2011) (ORDER).

[446] *Id.* at *7 (acknowledging that there "may be circumstances where using only one valuation methodology is appropriate and reliable"); *DFC Glob. Corp.*, 172 A.3d at 388 (recognizing that "[i]n some cases, it may be that a single valuation metric is the most

Compounding the problem of using a lone method, the Cantor Defendants say, is the fact that d'Almeida used just one comparable transaction.[447] And that transaction was more than three years old at the time that BGC acquired Berkeley Point.[448] Even still, I might be willing to adopt the myopic approach the plaintiffs advocate for if they had applied their methodology sensibly.

But the next deficiency the defendants highlight seriously calls into question the reliability of d'Almeida's approach. Specifically, the primary assumption underlying d'Almeida's methodology—that the market would have assigned the same multiples to Berkeley Point in 2014 as it would in 2017—does not hold up to scrutiny.

D'Almeida acknowledged that multiples are often adjusted to account for differences between the comparator and the company being valued (such as size, growth, profitability, risk, and return on investment) before being applied to the

reliable evidence of fair value and that giving weight to another factor will do nothing but distort that best estimate").

[447] *See LongPath Cap., LLC v. Ramtron Int'l Corp.*, 2015 WL 4540443, at *1 (Del. Ch. June 30, 2015) (rejecting a comparable transactions approach because its "two-observation data set d[id] not provide a reasonable basis to determine fair value").

[448] *See Kruse v. Synapse Wireless, Inc.*, 2020 WL 3969386, at *9 (Del. Ch. July 14, 2020) (finding that a 2012 merger "was not probative" of the subject company's value at the time of a 2016 merger because the precedent transaction was "stale").

subject.[449]   His decision not to adjust the 2014 transaction multiples to value

Berkeley Point in 2017 is unpersuasive for several reasons including that:

- Berkeley Point was coming off of multiple years of significant growth in 2017, as opposed to a year of steep decline in 2014.  It is therefore unlikely that the market would view Berkeley Point's future prospects equivalently in 2014 and 2017.[450]

- Two of the metrics d'Almeida used to justify his approach—fees earned per dollar of loans originated and origination fees as a share of origination volume—are considered only in terms of revenue (not profitability).[451]   If one takes into account expenses and looks at a traditional profitability metric like net income margin, she would conclude that Berkeley Point not only grew, but also became more profitable in the time between the two transactions.  Its net income margin increased from 12.4% in 2013 to 42.7% in 2016 (and to 38.4% for LTM June 2017).[452]

- Though d'Almeida looked to "Real Estate (Operations & Services)" metrics to support his view of general market trends, the database from which d'Almeida took his figures classifies Berkeley Point as a "Financial Services (Non-bank & Insurance)" company.  In that industry class, a range of financial metrics increased meaningfully between 2014 and 2017.[453]

- Berkeley Point experienced an extremely limited shift away from GSE loans from 2014 to 2017.  GSE loans accounted for at least 95% of Berkeley Point's loan production volume in every interim year.  Although forecasted growth in multifamily loan origination was lower

[449] D'Almeida Opening Report at 49.

[450] *See* JX 949 at 3; Day Tr. 17-19.

[451] Hubbard Rebuttal Report at 9-10.

[452] *Id.* at 40; JX 792 at 6; JX 661 at 14-15.  This net income calculation includes MSR originations and amortization.  The metric is informative here (unlike in the GGM) because the future income generated at a particular expense level is indicative of a certain form of profitability.  Further, the inflation in the margin caused by not adjusting net income is present in both years; it is a like-to-like comparison.

in 2017 than in 2014, an industry-wide trend towards GSE loans during the relevant period favored Berkeley Point.[454]

I therefore reject d'Almeida's assumption that Berkeley Point's multiples remained stagnant between 2014 and 2017.

In terms of the four specific multiples d'Almeida assessed, I conclude that only one—the "Price/Book Value" multiple, with adjustments—provides an appropriate measure of Berkeley Point's value. The other three—the two "EV/EBITDA" multiples and "Price less MSR Equity/Originations"—do not.

EV/EBITDA and Price less MSR Equity/Originations. An EV/EBITDA multiple is a commonly used valuation multiple that compares the enterprise value of a company to its EBITDA.[455] Recognizing that EBITDA is not a GAAP measure and can be calculated differently, d'Almeida analyzed two approaches: (1) Berkeley Point's internal approach to calculating EBITDA, which he calls the "BP Method"; and (2) Walker & Dunlop's approach, termed the "WD Method." Applying Berkeley Point's EV/EBITDA multiple from the 2014 CCRE acquisition to its 2017 adjusted EBITDA, d'Almeida generates Berkeley Point valuations of $589 million and $598 million using the BP Method and WD Method, respectively.[456]

---

[454] *Id.* at 10-13.

[455] D'Almeida Opening Report at 56.

[456] These figures are of July 16, 2017 (the day the Board approved the transaction and one day before signing). *Id.* at 116. D'Almeida's report puts forward two values for each multiple; one assuming BGC pays for its referrals and the other assuming it does not. The plaintiffs ask for damages based on the former scenario, and all the valuations discussed in

As Hubbard explained, however, enterprise-based multiples like EV/EBITDA are generally unsuitable for financial services firms like Berkeley Point.[457] Indeed, the data d'Almeida relied on to justify his decision not to adjust the 2014 multiples lacks EV/EBITDA ratios for firms categorized as "Financial Services (Non-bank & Insurance)," which includes Berkeley Point. And even if equity-based multiples were applicable for a company like Berkeley Point, the 2014 Berkeley Point transaction multiples could not reasonably be applied to Berkeley Point in 2017 without significant upward adjustment, as discussed above.

There are similar reasons to question the applicability of the Price less MSR Equity/Originations multiple. That multiple "effectively treats the value of loans, loan originations, and the servicing of new loans as a function of the volume of loan originations, adding this value to the book value of existing mortgage servicing rights."[458] D'Almeida generated a Berkeley Point valuation of $567.0 million using the 2014 Price less MSR Equity/Originations multiple.[459]

---

this section are those that d'Almeida calculated assuming BGC pays for its referrals. *Compare* Pls.' Post-trial Br. 76-77, *with* d'Almeida Opening Report at 116. I find it reasonable to include the value of affiliate loan referrals when considering the value of Berkeley Point. Servicing revenues from referrals already on Berkeley Point's books are effectively guaranteed, Berkeley Point generated the value and would continue to do so as part of BGC, and there is reason to believe that a third-party buyer would not have offered a similarly productive referral relationship. *See* Hubbard Opening Report at 11.

[457] Hubbard Opening Report at 50.

[458] D'Almeida Opening Report at 57-58.

[459] *Id.* at 116.

Hubbard noted that experts on investment valuation generally "caution[] against the use of price-to-sales multiples because sales are not readily measurable for financial services firms" such as Berkeley Point.[460]    Price less MSR Equity/Originations is sector-specific and relatively removed from cash flow.  And it does not seem to be widely used in the industry.[461]

Price/Book Value.    That leaves d'Almeida's valuation based on the Price/Book Value multiple.  Price/Book Value multiples are used when a company's balance sheet is closely representative of market value, as is the case with financing companies like Berkeley Point.[462]  Berkeley Point, for example, marks its loans and mortgage servicing rights at market value, making this multiple particularly apt.

There is also agreement between the experts that the Price/Book Value multiple can reasonably be applied to value Berkeley Point.[463]  The work of a leading corporate valuation expert confirms that price-to-earnings and price-to-book multiples are "by far the most popular ones for the valuation of financial institutions."[464]

---

[460] Hubbard Rebuttal Report at 17.

[461] *Id.* at 11-12.

[462] D'Almeida Opening Report at 57.

[463] *Id.* at 57; Hubbard Rebuttal Report at 26-27.

[464] Damodaran, *supra* note 392, at 582, 600; *see* Mario Massari et al., *The Valuation of Financial Companies* 126 (2014) ("We stress[] that the valuation of financial companies should be equity-side.").

D'Almeida values Berkeley Point at $590.5 million using the Price/Book Value multiple from the 2014 Berkeley Point transaction. He observes that this figure may be high because Berkeley Point has typically booked its MSRs aggressively when compared to third-party appraisers.[465]

The problem with d'Almeida's approach, once again, is that it does not properly adjust for the differences between 2014 and 2017. Price/Book Value multiples increased by 20.3% in the "Financial Services (Non-bank & Insurance")" sector as a whole across that three-year period.[466] As for Walker & Dunlop, that increase was even larger at 51.5%.[467]

I find it reasonable to value Berkeley Point by taking the average of these figures (a conservative approach given Berkeley Point's similarity to Walker & Dunlop and the tailwinds described above),[468] applying it to Berkeley Point's 2014 Price/Book multiple (generating a multiple of 1.64), and multiplying Berkeley Point's 2017 Book Value by that adjusted multiple. Doing so indicates a value for Berkeley Point of $805 million. I view that figure as a reliable indicator of Berkeley Point's value at the time of the acquisition.

---

[465] D'Almeida Opening Report at 62-63.

[466] Hubbard Rebuttal Report at 42.

[467] *Id.* at 41.

[468] *See supra* notes 250-54.

2017 Buyout Cross-check.   The last of d'Almeida's analyses is a "cross-check" of his guideline transaction analysis via a consideration of the 2017 CCRE buyouts.  By backing out the book value of the CMBS business from the average value of CCRE implied by the prices Cantor paid to the other investors, d'Almeida calculated a Berkeley Point valuation of $624 million.[469]

Cantor's CCRE buyouts were governed by a limited partner agreement that included a preferred rate of return for the limited partners that were bought out (and considered as part of d'Almeida's valuation).[470]  As a result, the buyout of the limited partners' interests in CCRE was less about the value of Berkeley Point (and the CMBS business) than the limited partners' expected returns and the relative illiquidity of their stakes.[471]  A rough calculation of the limited partners' returns shows that their buyout prices aligned with the preferred returns in the agreement.[472] The cross-check cannot serve as a reliable indicator of Berkeley Point's value given that fact.

*          *          *

---

[469] D'Almeida Opening Report at 72.

[470] *See* JX 95 §§ 8.3, 11.1; *id.* at 18, 92-93; *see* d'Almeida Opening Report at 112-13.

[471] *See* Lutnick Tr. 1248-52.

[472] For example, Ohio State Teachers Retirement System's 2 million units, purchased for $200 million in August 2011, was bought out for about $354 million, as agreed in February 2017.  JX 95 at 93; PTO ¶ 77.  A 11.5% annual return on a $200 million investment over five-and-a-half years would be worth about $364 million (about 3% off the actual buyout price).

The reasonable and reliable analyses put forward by the experts creates a fairness range for Berkeley Point of $805 million (using an adjusted Price/Book Value multiple) to $924 million and $1,164 million (using Walker & Dunlop's price-to-earnings and price-to-book multiples, respectively). The $875 million acquisition price falls within that range. The price was therefore fair.

### b. The CMBS Investment

BGC's $100 million investment into CCRE for 27.3% of the remaining CMBS business received considerably less attention from the parties than the Berkeley Point acquisition. Nonetheless, I must assess whether BGC's investment in the CMBS business was financially fair.

The investment's terms included a preferred 5% yearly return that prohibited Cantor from receiving distributions from the CMBS business until that 5% return was achieved.[473] BGC earned 60% of any difference between BGC's preferred 5% return and the CMBS business's percentage return.[474] The terms also allowed BGC to redeem the entirety of its $100 million investment at the end of the five year investment period and Cantor provided BGC downside protection by taking on

---

[473] JX 570.

[474] D'Almeida Opening Report at 87-88.

liability for the first $36.7 million in any losses.[475] Cantor invested $266 million into the CMBS business alongside BGC.[476]

The fact that the Special Committee negotiated the cost of the investment down from $150 million to $100 million is evidence of fairness. BGC was able to obtain the same strategically valuable data with a significantly lower investment. The final terms also reflected the Special Committee's efforts to obtain additional downside protections while maintaining BGC's preferred return. After analyzing the investment from a variety of angles, including comparing it to similarly structured debt offerings in the market, Sandler concluded that the terms were reasonable to BGC.[477]

The Cantor Defendants offered Hubbard's testimony in further support of the financial fairness of the CMBS investment. Hubbard evaluated the fairness of the CMBS investment by estimating BGC's weighted average cost of financing the investment and comparing it to BGC's expected rate of return in the investment.[478]

Hubbard calculated the weighted average cost of financing as 5.2%.[479] He considered the actual credit agreements that financed the transaction to calculate the

---

[475] *Id.* at 64.

[476] Lutnick Tr. 1289-90.

[477] JX 658; JX 663 at 23-26; Sterling Tr. 240-42.

[478] *See* Hubbard Opening Report at 60, 67-68.

[479] *Id.* at 67.

cost of debt, and he calculated the cost of equity using a standard capital asset pricing model, estimating BGC's beta by taking the median beta for Newmark's peer group.[480] By looking at the actual proceeds raised in Newmark's IPO—which were used to pay off some of the debt raised to finance the investment—Hubbard estimated that the transaction's financing was split 31.2% to 68.8% between equity and debt.[481]

Hubbard then concluded that the CMBS business had to generate 8.7% or more in returns (given the intricacies of how returns in the joint venture were shared between BGC and Cantor) in order for BGC to satisfy the implied 5.2% hurdle rate.[482] To calculate the expected return of the CMBS investment (and therefore determine whether 8.7% or higher returns were reasonable), Hubbard looked at "industry benchmarks."[483] Justifying his approach on the general mandate given to the CMBS business, Hubbard looked at the median returns on equity for two broad

---

[480] Hubbard Opening Report at 66-67. The risk-free rate and equity risk premium were equated to the return on a 20-year U.S. Treasury bond and the average of historical and supply-side equity risk premium published by Duff & Phelps, respectively. *Id.* at 39, 41-42.

[481] *Id.* at 65.

[482] *Id.* at 67.

[483] *Id.* at 68.

Standard & Poor's industry classifications—"Thrifts & Mortgage Finance" and "Real Estate"—finding returns of 8.1% and 7.6% respectively.[484]

Hubbard concluded that an 8.7% return could be reasonably expected because 8.7% was in the interquartile range for both classifications. Any estimate of expected returns tilts conservative as it ignores the added value the CMBS investment brought to BGC in terms of providing it access to proprietary real estate information and data.[485] It also does not account for the value of the downside risk that Cantor bore on any potential first losses.

Hubbard discounted the fact that the CMBS business had not been profitable in the several years before the transaction because the "infusion of new capital into the JV" from BGC and Cantor created a transformed entity with a broad mandate to engage in "any acts or activities (including investments) in any real estate related business or asset-backed securities related business."[486] The plaintiffs and d'Almeida dispute Hubbard's valuation primarily on this basis—that is, they contend that projected returns for the CMBS investment are unrealistic because it had lost money in the years before the transaction.[487] But one must only look to the

---

[484] *Id.* The interquartile ranges for Thrifts & Mortgage Finance and Real Estate were 4.8-12% and 3.5-11.3%. *Id.*

[485] *Id.*; *see* JX 983 at 2 (noting the value of CMBS's "substantial database" as a reason for investing into the business).

[486] Hubbard Opening Report at 63-64 (quoting JX 713 at 23).

[487] D'Almeida Rebuttal Report at 51-52; Pls.' Post-trial Br. 88-90.

years from 2011 to 2014 to see that the CMBS business had the potential to be profitable.[488] It is also unclear why Cantor would itself invest hundreds of millions of dollars into what it thought would be a losing enterprise.[489]

Accordingly, I conclude that the CMBS investment was economically fair.

### 3. Unitary Fairness Analysis

Although fairness has two component parts—price and process—the court must make a "single judgment that considers each of these aspects."[490] "A strong record of fair dealing can influence the fair price inquiry, reinforcing the unitary nature of the entire fairness test. The converse is equally true: process can infect price."[491]

The transaction was fair in all respects to BGC and its minority stockholders. There were certainly flaws—namely, Lutnick's involvement in selecting the Special Committee's chairs and advisors and Moran's interactions with Lutnick, which were withheld from his fellow Special Committee members. But there is no evidence that those problems rendered the process unfair. The record demonstrates that the Special Committee undertook good faith, arm's length negotiations with the

---

[488] Cantor Defs.' Pre-trial Br. 55-56. For the last three quarters of 2014, for example, the CMBS business's annualized quarterly return on equity were 17.1%, 8.7%, and 2%. JX 950.

[489] *See* Pls.' Post-trial Br. 89.

[490] *Cinerama*, 663 A.2d at 1139-40.

[491] *Reis*, 28 A.3d at 467.

guidance of independent advisors that resulted in a deal with a favorable structure and a fair price.[492]

## C. Claim Against Moran

Finally, I consider the claim against Moran—the sole claim that remained against an outside director at trial. The plaintiffs allege that Moran breached his duty of loyalty under the second prong of *Cornerstone*. Given my findings earlier in this decision, I hold that he did not.

Under *Cornerstone*, a non-independent director who acts "to advance the self-interest of an interested party" can be held liable for a non-exculpated claim.[493] That is, as this court explained at the summary judgment stage, the plaintiffs can only prevail if they show both that Moran is not independent of Lutnick and that he actively furthered his interests.[494]

Moran is independent of Lutnick for purposes of evaluating demand futility. He is likewise independent for purposes of assessing the plaintiff's fiduciary duty

---

[492] *Cinerama*, 663 A.2d at 1444 (concluding that despite the process being "flawed," the transaction was fair where "the board was insufficiently informed to make a judgment worthy of presumptive deference, nevertheless considering the whole course of events, including the process that was followed, the price that was achieved, and the honest motivation of the board to achieve the most financially beneficial transaction available").

[493] *In re Cornerstone Therapeutics Inc. S'holder Litig.*, 115 A.3d 1173, 1179-80 (Del. 2015).

[494] *In re BGC P'rs*, 2021 WL 4271788, at *10; *see In re Oracle Corp. Deriv. Litig.*, 2021 WL 2530961, at *7, *9 (Del. Ch. June 21, 2021) (describing the second prong of *Cornerstone* as a "two-prong test").

claim. Moran was not so "beholden" to Lutnick or "under [Lutnick's] influence that his discretion [in the transaction] was sterilized."[495]

Moran also did not act to substantially further Lutnick's interests in the transaction. Moran's behavior was not perfect, as detailed in this decision. He certainly should not have discussed advisors for the Special Committee with Lutnick and he should have kept his fellow Committee members apprised of those actions.

This was negligent behavior on his part—perhaps even grossly so. Moran was a longtime director and must have known better. But I do not believe that Moran acted disloyally.

Moran worked tirelessly on behalf of the Special Committee. He participated in numerous meetings and dug in to understand the potential transaction. He worked closely with independent advisors.[496] He advocated for a deal structure that furthered BGC's minority stockholders over Cantor. He was prepared to say no to Lutnick and walk away if the deal was not to the Special Committee's liking.

On these facts, and given his independence from Lutnick, he is not liable for breaching his fiduciary duties.

---

[495] *In re MFW*, 67 A.3d at 509.

[496] *See McMillan v. Intercargo Corp.*, 768 A.2d 492, 505 n.55 (Del. Ch. 2000) (explaining that "[t]he board's reliance upon an investment banker . . . is another factor weighing against the plaintiffs' ability to state an actionable claim that the defendant directors").

## III. CONCLUSION

BGC's acquisition of Berkeley Point and investment in CCRE's CMBS business was entirely fair. Therefore, the Cantor Defendants are not liable for breaching their fiduciary duties. In addition, Moran is not liable for breaching his duty of loyalty. Judgment after trial is for the defendants. The parties shall submit within thirty days a stipulated form of final judgment.